DONOVAN SANFORD, Appellee, v. ROBERT L. GOODRIDGE et al., Appellants.

No. 46395.

FEBRUARY 10, 1944.

REHEARING DENIED JUNE 6, 1944.

Carr, Cox, Evans & Riley, of Des Moines, and Kenneth H. Davenport, of Creston, for appellants.

Thomas E. Mullin, of Creston, and Harvey J. Kittleman, of Corning, for appellee.

MULRONEY, J.—Shortly after noon on August 6, 1940, Robert Goodridge was driving his pick-up truck in a westerly direction on a dirt road southeast of Creston, Iowa. At about the same time plaintiff was driving a pick-up truck in a southerly direction on another dirt road known as the Pole Road. Somewhere in the intersection of these two roads the trucks collided. As a result of the collision plaintiff suffered injuries and was confined in the hospital at Creston and later at his home. In his suit against Goodridge he joined Armour Creameries and Armour & Company, who he alleged were Goodridge's employers. The jury returned a verdict against all of the defendants in favor of the plaintiff for $4,000.

Upon this appeal the defendants assign error in the giving of one instruction and the failure to direct the verdict for de-

fendants on the ground that plaintiff was shown to be contributorily negligent as a matter of law. The defendants Armour Creameries and Armour & Company assign additional error in the refusal of the trial court to sustain their motions for directed verdicts, made at the close of plaintiff's testimony and at the close of all the testimony, on the ground that plaintiff failed to prove Goodridge was their employee and that all the evidence showed him to be an independent contractor. These defendants also alleged error in submitting to the jury a written contract between Goodridge and Armours, on the ground that the relationship between the parties and the construction of the contract were questions for the court to decide as questions of law.

■ I. The instruction complained of is No. 11, where, in enumerating the grounds of negligence that were submitted, the court stated in ground 2:

"That the defendant, approaching such intersection from the left, failed to yield the right-of-way to the plaintiff who was approaching said intersection on the right."

The statute governing the right of way at intersections on August 6, 1940 (section 5026.01, Code of 1939), provided that the first vehicle in the intersection had the right of way, and in the event the two vehicles entered the intersection at the same time, the one on the right should have the right of way. But this statute was quoted and the rights and duties thereunder explained in Instruction No. 13, which was given for the express purpose of explaining this second ground of negligence. Since defendants admit that Instruction No. 13 correctly states the law with regard to the right of way at the intersection, and since Instruction No. 13 states that it is for the purpose of explaining the law "as to the second ground of negligence," we hold that no prejudicial error occurred.

■ II. Under the record in this case the question of contributory negligence was for the jury. The accident happened at a blind intersection, in that there was a cornfield on the northeast corner of the intersection. Neither party could see the other until he entered the intersection. Plaintiff said he was going twenty-five miles an hour; that he entered the intersection first and that Goodridge was traveling fifty miles an hour.

Goodridge said he was going fifteen miles an hour; that he entered the intersection first and that plaintiff was traveling fifty miles an hour. Plaintiff testified he was twenty or thirty feet into the intersection (from the fence line) when he first saw Goodridge about thirty feet east of his car. Goodridge said he was twenty feet from the traveled portion of the intersection when he first saw plaintiff thirty feet north of the main-traveled part of the intersection, and he stated:

"I was intending to turn north at this corner. When I looked to the north I saw a truck approaching and knew I couldn't stay on my right side of the road without swinging over into the middle, causing a head-on collision, so [I] started to turn south but didn't make it. I used my brakes also."

The evidence of all the witnesses would indicate that the collision occurred at the southwest corner of the intersection, although Goodridge at one place said it occurred "on the west side of the north-and-south road and in the middle of the intersection."

With such sharply conflicting testimony the court could not rule that plaintiff was guilty of contributory negligence as a matter of law. Whether he was traveling too fast when he entered the intersection and whether he entered the intersection first were questions for the jury. Surely, under this record, the jury would be warranted in finding Goodridge was traveling faster than fifteen miles an hour. Admittedly, he was traveling so fast that he could not make his intended right turn and stay on his own right side of the Pole Road. While the evidence of the defendant Goodridge's negligence is not important in considering the question of contributory negligence of the plaintiff, we feel it has some importance in this case as an explanation of the physical facts which defendants claim aid in the establishment of contributory negligence as a matter of law. Defendants point to the evidence that after the collision plaintiff's truck proceeded across a ditch, up over a bank, and into a fence where it broke off a corner post eight or ten inches in diameter; also that Goodridge's truck spun around, headed east, and turned upside down. In their argument defendants urge that "this Court has the right to look at the [these] physical facts in deciding whether the

appellee [plaintiff] was approaching and traversing this intersection with his vehicle under control." The trouble with this argument is that we are unable to state as a matter of law that the momentum that propelled plaintiff's truck was not imparted to it by the Goodridge truck running into it at a high rate of speed. The argument that the position of the Goodridge truck after the collision refutes such a claim is not conclusive. It will be remembered this truck was turning north and the collision near its right front wheel might have upset it in the position it was in after the collision, even if it were traveling at a higher rate of speed than fifteen miles an hour.

This case well illustrates the wisdom of the rule that ordinarily the question of contributory negligence is for the jury. It would have been error to direct the verdict on this ground. Rogers v. Jefferson, 224 Iowa 324, 275 N. W. 874.

III. The record of the trial below and the briefs and arguments filed in this court indicate that the major battle raged around the issue of whether Goodridge was an employee of Armour Creameries and Armour & Company or an independent contractor.

Armour & Company operated under the trade name of Armour Creameries, so they will hereinafter be referred to as Armours.

The issue of whether Goodridge was an employee was presented in the motions for directed verdict made by Armours at the close of plaintiff's testimony and at the close of defendants' testimony. We will only consider the ruling upon the motion made at the close of all the testimony.

The defendants' evidence on this issue consisted of a written contract entered into between Armours and Goodridge. The contract designated Armour's Creamery at Creston as the "factory" and Goodridge as the "carrier." It described Goodridge as "engaged in the hauling business as an independent contractor." It provided that the carrier should haul cream to the factory from certain designated farms within a radius of thirty miles from the factory by means of his own truck. The carrier was to haul whatever cream was tendered to him by the "patrons" (sometimes called farmers, producers, or customers) from day to day for transportation to the factory and he was

also to haul to the patrons such empty cans as the company desired sent to them. By the terms of the contract the carrier's remuneration was based on the pounds of butterfat delivered to the factory. The carrier agreed to protect the cream from heat and freezing and agreed that cream spilled by him would be paid for out of his compensation. Paragraph 6 of the contract provided:

"The Carrier shall have full and complete liberty to use his own free and uncontrolled will, judgment and discretion as to the methods and manner of his performance of each and every obligation hereunder, without any right whatever on the part of the Company to direct or control, in any way or in any degree, the methods or manner of the performance of any of said obligations; and the same may be done or performed by any person or persons appointed by him. It is understood and agreed that, anything herein or in the previous relationship (if any) between the parties hereto to the contrary notwithstanding, the Company expressly disclaims possession by it of any rights with respect to the Carrier except the rights conferred by law upon one who has made a contract with an independent contractor; and the Carrier likewise expressly disclaims possession of any rights with respect to the Company except those to which an independent contractor is entitled by law. The Carrier shall at all times be free to do such other hauling or other business as he may desire; except that, during the term hereof, he shall not haul cream from any of the Company's patrons to any other factory."

In the succeeding paragraphs of the contract provision was made for the carrier to carry workmen's-compensation insurance on his own employees and for indemnifying the company from liability on account of loss or damage to property or injuries to persons "arising out of or in connection with the performance of this Agreement by the Carrier." Further provision was made in the contract whereby the carrier "requests and authorizes the Company to procure and keep in force" public-liability and property-damage insurance "for the protection of the Company only," insuring it against such liability for "property damage, personal injury and/or death" and the carrier agreed to reimburse the company for the cost of such insurance to the extent of one-half per cent of his re-

muneration under the contract. The carrier accepted full and exclusive liability for the payment of taxes, including contributions for unemployment insurance and old-age benefits and also taxes and license fees in connection with the transportation. The contract was to remain in force until terminated by either party giving the other two weeks' written notice, and failure on the part of the carrier to transport cream to the company's factory would entitle the company to $25 liquidation damages. This was the contract Goodridge signed when he took over a cream route for Armours in July of 1940, or, as Armours' manager put it, when he "went to work" for them.

The principles governing the determination of the question as to whether a contract is independent upon the part of the contractor or one of employment is easy of statement but sometimes difficult of application. Burns v. Eno, 213 Iowa 881, 240 N. W. 209. An independent contractor is one who, by virtue of his contract, possesses independence in the manner and method of performing the work he has contracted to perform for the other party to the contract. This other party to the contract must relinquish the right of control ordinarily enjoyed by an employer of labor and reserve only control as to the results of the contract before the independent-contractor relationship is created. Mallinger v. Webster City Oil Co., 211 Iowa 847, 234 N. W. 254; Niemann v. Iowa Electric Co., 218 Iowa 127, 253 N. W. 815. Whether the party for whom the work was to be performed had the right to dictate and control the manner, means, and details of performing the service is the test to be applied. If he did have such rights, then, under the doctrine of respondeat superior, he is liable for the workman's tort. If he did not have such rights, then the workman did not have a master who could be required to respond in damages to the person injured by the workman. But the independent-contractor relationship requires an agreement in fact made and carried out in good faith. The law looks to the substance and not to the form of the contract to determine the relationship. It will not do for an employer to make a contract which in many clauses loudly proclaims the independence of his contracting workman and in other clauses circumvents this granted freedom by retaining in himself the control that employers ordinarily possess over their

employees. An employer cannot insulate himself against the burdens of the employer-employee relationship by a contract that leaves him with the control benefits of that relationship. Nor can he escape his liability under the doctrine of respondeat superior by a contract that expressly provides that the workman is an independent contractor, if in fact, under the entire contract, the workman only possesses the same independence that employees in general enjoy.

This was a contract providing for daily services. The clause that gave Armours the right arbitrarily to cancel the contract without liability is somewhat inconsistent with the theory that Goodridge was independent. The presence of such a clause in a contract, which is termed an independent-contractor agreement, renders it somewhat suspect when the contract calls for daily services. Obviously, with such a clause, Armours could wield the same control over Goodridge that they could if he were an employee. While we do not say that there can be no independent-contractor relationship if a contract can be arbitrarily canceled by the parties, we do say that with the full sweep of the clause the person for whom the service is being performed could exert employer control over the performer. In this connection we need pay no attention to the two-weeks' notice-of-cancellation provision. This would amount to no more than the notice of dismissal that a humble house servant might receive under an employment contract. Besides, the provision seems to have been more honored in its breach than in its observance. The route supervisor for Armours testified that no written notice was given to Goodridge terminating the contract after the accident. He stated: "He [Goodridge] just quit or was discharged." He also testified: "As route supervisor I had authority to hire and fire route men. I have hired and fired ten or fifteen route men since I have been over there. I gave no written notice to those I fired." Nor did Armours receive any written notice from Goodridge, or any other route men, terminating route contracts.

The question to be decided is whether under this contract Armours had the right to control Goodridge as to details of performance. Clause 6 said Armours possessed no such right. But every provision of clause 6 could be nullified with immunity

by Armours' threat of cancellation if all of their orders given, even in contradiction to clause 6, were not obeyed. Clearly the contract, standing alone, leaves the question of Goodridge's independence unanswered. What did the parties to the contract intend? In spite of clause 6, was it understood between the parties that Armours were to have the power to exercise control and Goodridge was to obey the control orders or be fired? The record of performance under the contract is significant. The carrier, for no extra remuneration, was required to carry Armours' butter with him at all times and to distribute it to patrons who paid for it by deductions from their cream checks. In fact, Goodridge testified he sold about six pounds of butter daily. The manager's statement that they had never caught any driver carrying Swift's butter, but that there was nothing to prevent them from doing so if they wanted to, cannot be accepted as much evidence establishing Goodridge's independence. The word "caught" has an ominous sound which might portend dismissal for the butter peddler for Armours' business rival. The carrier had the privilege of selling Armours' feeds to the farmers at a small margin of profit and the privilege of buying poultry for Armours for which the company would pay him one cent a pound. The supervisor traveled with Goodridge when he started on the route, introducing him to the producers, advising him "about the butter orders he would be called upon to fill," the proper method of keeping track of the cans, and the care he was to exercise in handling the cream. He also told Goodridge of his daily duties with regard to dumping the cream at the creamery and washing the cans on the mechanical can-washer. He traveled with Goodridge about once a month after he started hauling and together they endeavored to get new customers for the route. Goodridge testified he had extended the route after he took it over, reporting the new customers he secured to Armours. When there would be a meeting of Armours' employees at the creamery, the route drivers would be asked to attend if route questions were to be discussed. Another route driver testified he attended one such meeting where he was schooled in regard to selling feed. The day after the accident Goodridge made a report of the accident to Armours. The report

was typed in Armours' office and signed by Goodridge, but he did not remember who asked him to make it.

The evidence that the route driver was admittedly a butter salesman and perhaps a poultry buyer and feed salesman for Armours would serve to negative his claimed independence. The evidence of the instructions to Goodridge by Armours concerning the care he was to exercise in handling the cream and his duties with respect to washing cans would indicate control over the methods of carrying out the contract. In this connection, Armours' manager testified, ''The protection of the cream that we required might go further than the State requirements * * * although they are very similar.'' The contract merely required the hauling of the cream ''in a sanitary manner conforming to all applicable sanitation and health requirements imposed by public authority.'' The use of the terms ''hiring,'' ''firing,'' and ''discharging,'' in connection with Goodridge and other route drivers, in the testimony of the route supervisor who signed the contract for Armours could be considered by the jury as bearing upon whether the contract was one for controlled employment or for independent service. Such a record of performance under the contract certainly presents a question of fact on the subject of Goodridge's asserted independence and Armours' claimed lack of interest except in results. From such evidence the jury could well find that in the clauses wherein Armours forswore control over Goodridge they were only paying lip service to his independence with the intention to dictate the manner and means of performance. The jury could find that the written contract did not constitute the entire agreement between the parties. See Thomson v. United States, 321 U. S. 19, 25, 64 S. Ct. 392, 395, 88 L. Ed. 513, 517, where, in commenting upon the railroads' contracts with motor-vehicle operators, the court stated:

''The provisions and actual operation of the contracts with the operators demonstrate the railroad's rigid control over the movement of the freight * * * The operators are 'independent' only by grace of contract nomenclature. By any realistic test they are mere aids in carrying out a part of the railroad's coordinated rail-motor freight service.''

Other evidence is not lacking which likewise indicates that control authority was lodged in Armours. Section 3100.34 of the Code of Iowa, 1939, provides as follows:

"No creamery or cream station or vehicle for the collection of cream shall be operated unless the owner or operator shall have first obtained from the secretary a license for each creamery, each cream station, and each vehicle so owned or operated."

Goodridge was not in the business of hauling cream generally. The evidence showed that the required license for this particular route was secured in the name of Armours and procured and paid for by Armours in March of 1940, when the route was established. Armours' manager testified that he knew the license was for one year and that it was not transferable. The statute provides that the "operator" should obtain a route license. Armours held themselves out as the operator of the route when they obtained the license. Goodridge had no license to operate this route. License control over the route would be evidence that Armours had control over the person who operated the route for them. Towers v. Watson Bros. Transp. Co., 229 Iowa 387, 294 N. W. 594; Hough v. Central States Freight Service, 222 Iowa 548, 269 N. W. 1. The fact that the contract provided for insurance coverage for Armours' liability would likewise be some evidence that they considered Goodridge an employee capable of rendering them liable as his employer.

IV. What we have said disposes of the last assignment of error, wherein Armours argue that the court erred in submitting the written contract to the jury because the subject of the contract was a matter of law to be decided by the court. The inquiry here was whether or not the worker was independent. The construction of the written contract was not questioned. The actual amount of freedom and independence it granted to the worker was challenged. Some of the clauses in the contract would be evidence that tended to establish Goodridge's independence. As we have seen, the arbitrary cancellation clause would be evidence tending to establish Goodridge's dependence. The contract was rightly submitted to the jury together with

other evidence tending to prove Goodridge's status as an employee or independent contractor.

Under the whole record, we find no error and the case is therefore affirmed.—Affirmed.

All JUSTICES concur.