DELORES SANDROCK, ADMINISTRATRIX OF THE ESTATE OF GEORGE B. SANDROCK, DECEASED, APPELLEE, v. ROBERT L. TAYLOR ER AL., APPELLANTS.

174 N. W. 2d 186

Filed January 30, 1970. No. 37275.

Gleystein, Nelson, Harper, Kunze & Eidsmoe, Jewell, Otte & Pollock, Deutsch & Hagen, David W. Curtiss, Baylor, Evnen, Baylor, Urbom & Curtiss, Robert T. Grimit, Ryan & Scoville, and Frank Brady, for appellants.

Warren C. Schrempp and O. William Von Seggern of

Schrempp, Rosenthal & Bruckner, and Philip H. Robinson, Jr., for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, and McCOWN, JJ.

McCOWN, J.

This is an action for damages for the death of the plaintiff's decedent in a motor vehicle accident at a country road intersection.

The accident occurred between 1 and 1:30 p.m. on August 2, 1963, at a country road intersection located south and east of Hartington, Cedar County, Nebraska. The weather was clear and the roads were dry. There were no stop signs at the intersection. There was a cornfield southeast of the intersection. The corn was 7 to 8 feet high and there were high weeds growing in the road ditches and along the fence lines. The ground level in the cornfield was somewhat higher than the roads in the area approaching the intersection.

The decedent, George B. Sandrock, was a guest passenger in an automobile driven by the defendant Casper B. Meirose. The Meirose car was proceeding north. The defendant Robert L. Taylor was driving a partially loaded milk tank truck in a westerly direction. The empty weight of the milk truck was 10,000 pounds. The tank capacity was 15,000 pounds and it was carrying 8,000 to 10,000 pounds of milk. The two vehicles collided approximately in the center of the intersection and George B. Sandrock was killed.

The defendant Osceola County Cooperative Creamery Association operated the Cooperative Marketing Association of Laurel, Nebraska, under that trade name, and will be hereafter referred to as Co-op. Co-op was joined as a defendant on allegations that the defendant Taylor was the agent, servant, or employee of Co-op and operating the milk truck in the course of its business.

The jury brought in a verdict of $46,712 against all defendants, and all defendants have appealed.

The first problems involve the negligence of the defendant Taylor. Taylor's position is that he had the directional right-of-way as a matter of law; that the accident was due solely to Meirose' negligence; and that there was insufficient evidence of negligence on Taylor's part to submit the issue of his negligence to the jury. The plaintiff relies on the rule in effect at the time of the accident, that when approaching an intersection a driver traveling at an unlawful speed forfeited any right-of-way which he would ordinarily have in being the vehicle approaching on the right. The general limitation to a reasonable and proper speed was, of course, applicable, and the specific maximum speed on the roads involved here was 50 miles per hour. See § 39-723, R. R. S. 1943.

Taylor testified that a partial load of milk in the milk tank produces a shifting motion when the truck is stopped or turned. He also testified that he had had trouble on the day of the accident because of the shifting of the milk load and that it made it harder to stop. He testified that his speed as he approached the intersection was 35 to 40 miles an hour, the same speed at which he testified the Meirose car was going. He admitted that he had previously asserted that Meirose was driving 55 miles per hour. When Taylor was 125 feet away from the intersection he knew that the Meirose car was proceeding toward the intersection. He saw the Meirose car, started to slow up, and when he saw the Meirose car was not going to stop, he slammed on his brakes 50 or 60 feet from the intersection.

The only witness other than Taylor who testified as to the speed of the milk truck was Mrs. Mary Smith. The driveway to her farm home was 3/10's of a mile east of the intersection. Mrs. Smith was in her yard hanging up clothes. She was about 1½ city blocks south of the east-west road on which the milk truck was traveling. There was a hill to the west of her, the crest of which was 575 feet east of the intersection. Mrs. Smith saw

the truck as it approached her driveway from the east and until it passed over the crest of the hill to the west. She estimated the speed of the truck to be 60 miles per hour and testified that it maintained the same speed and did not slow up during the time she observed it. She could not see the intersection itself from her yard, nor did she know the accident had happened until later.

Taylor and Co-op assign as error the overruling of objections to the testimony of Mrs. Smith as to the speed of the milk truck. It is their position that the testimony of Mrs. Smith as to speed relates to a place too remote from the point of the accident to be admissible.

The critical issue as to the admission of such evidence involves the relative proximity in distance and time and the inferences that can reasonably be drawn from the facts testified to. Where a reasonable inference can be drawn that the speed testified to was continued at approximately the same rate to the crucial point of determination, the evidence is ordinarily admissible. See Shields v. County of Buffalo, 161 Neb. 34, 71 N. W. 2d 701.

Here the witness observed the speed of the truck while it traveled a distance of more than a quarter of a mile and during that time, the same speed was maintained. Although the witness' point of observation was some 3/10's of a mile away from the intersection, she observed the truck and its speed until the truck was within 575 feet of the intersection and from that point it passed downgrade and out of sight of the witness. The defendant Taylor testified that he first slowed his speed when he was 125 feet from the intersection and at the time he saw the Meirose car.

Ordinarily the question of the admissibility of evidence as to the speed of a vehicle shortly prior to the time of an accident rests largely in the discretion of the court. Buhrman v. Smollen, 164 Neb. 655, 83 N. W. 2d 386. Under the circumstances here, the trial court did not

abuse its discretion in admitting the testimony of Mrs. Smith.

At the time of this accident, section 39-751 (2), R. R. S. 1943, dealing with right-of-way at intersections, provided as follows: "The driver of any vehicle traveling at an unlawful speed shall forfeit any right-of-way which he might otherwise have hereunder." There was also evidence from which a jury might have found that in view of the weight and condition of the load, and the obstructions to view, Taylor was traveling at a speed greater than reasonable and proper, and failed to slow down for the intersection. Possible inferences might also be drawn that he failed to apply his brakes immediately when he observed the Meirose car. The evidence here was sufficient to go to the jury on the issue of Taylor's negligence, and he was not entitled to a directed verdict against the plaintiff as a matter of law.

The next issues involve Co-op's assertions that Taylor was an independent contractor, and was not acting as a servant or agent of Co-op. Co-op contends that it is therefore absolved from liability because there was no master-servant relationship.

Prior to September 19, 1961, Co-op owned all of the milk trucks used in the business and the drivers, including the defendant Taylor, were employees. At about that time, at the instigation of the drivers during a strike, arrangements were changed and a form of "carrier's contract" was executed with the individual drivers, including the defendant Taylor. Taylor was designated the "carrier" and the contract provided that he was to render daily fresh sweet milk delivery, including Sundays and holidays, between Co-op's creamery and the respective farms on its bulk routes. The transportation service was to be furnished by suitable insulated equipment supplied, maintained, and operated by Taylor at his own expense and required him to deliver whatever milk was tendered to him from each and every place situated on Co-op's milk route. It also required him to

deliver butter, calf feeds, and products used in sanitation for the production of milk as directed by Co-op. Co-op reserved the right to revise bulk routes at 3-month intervals.

Taylor was required to notify Co-op by telephone or otherwise as soon as possible if any emergency prevented furnishing transportation service on any certain day or days. He was also required to take reasonable care of any of Co-op's equipment loaned to him.

Transportation service was to be satisfactory to Co-op and all shippers on the route and Co-op agreed to collect from each shipper and pay to Taylor the amounts each shipper authorized Co-op to deduct for that purpose from any payments due the shipper on milk delivered to Co-op. These payments were originally monthly, but by addendum they were made semi-monthly. The hauling rate was 25 cents per 100 pounds of fresh sweet milk delivered to Co-op, which was to be charged to producers and deducted from the producers' check by Co-op. In addition, Co-op agreed, "in the interest of providing Carrier with enough income to avoid hardship," to subsidize the hauling rate when the daily average weight of milk transported was less than 20,000 pounds. The direct subsidy ranged from 3 cents per 100 pounds to 1 cent per 100 pounds.

Taylor was required to perform his obligations under the contract personally except for use of a relief man paid by Taylor. Taylor could not employ any person objectionable to Co-op and was forbidden to continue employment of any employee beyond 2-weeks notice who was objectionable to Co-op. The contract was not assignable by Taylor.

The contract provided that Taylor should have complete liberty to use his own discretion and judgment as to the method and manner of performance without any right on the part of Co-op to direct or control his performance. It also required him to furnish and maintain in effect workmen's compensation insurance on his own

employees if required by law, and public liability, property damage, and cargo insurance on the equipment. Taylor was to pay all taxes and license fees. The parties expressly disclaimed possession by either of any rights with respect to the other except those conferred by law applicable to an independent contractor.

The contract also provided that Co-op would furnish Taylor with suitable facilities for daily cleaning of the bulk tank and the materials necessary for use, at Co-op's plant. Taylor was also required to provide Co-op with accurate samples for whatever tests might be required by Co-op regarding butterfat content, sediment content, and bacteria activity, and accurate readings of producer's dip-sticks and weight charts.

The contract also provided for purchase of the tank truck from Co-op by Taylor and for the method of payment. "As a deterrent toward violation of this contract," Co-op reserved the right to consider all payments made by Taylor forfeited if he "solicits business for a competitor or . . . breaks contract by working for a competitor."

The contract was for a period of 1 year. It was automatically renewable from year to year in the absence of written notice by either party not later than 30 days prior to the end of the year. Co-op, however, reserved the right to terminate the contract by 30-days written notice to Taylor at any time.

In addition to the written contract, the evidence established that Taylor's first tank and chassis were purchased and financed through Co-op, but the tank truck involved in this accident was bought by Taylor from an independent dealer. Taylor testified that Co-op had to approve his truck sale at the time he purchased the new equipment.

Taylor was also required to measure quantities of milk at the farms, Co-op relied on his milk readings, and relied on him to take samples and supply them. Co-op gives a new driver training in picking up milk, and

making accurate tests for Co-op. Co-op's name was on each ticket furnished to the producers and Taylor signed the receipt for Co-op. Taylor also delivered butter and feed for Co-op to the various producers on his route. For this he was paid 1 cent per pound for butter and received approximately 1 cent per pound for feed. Solicitation of new customers was sometimes by Taylor and sometimes by Co-op.

In determining whether an individual is a servant as distinguished from an independent contractor, under the doctrine of respondeat superior, the basic test is whether or not his physical conduct in the performance of the service is controlled or is subject to the right of control. See Restatement 2d, Agency, § 2, p. 12. See, also, Restatement 2d, Agency, § 220, p. 485. The latter section also sets out particular matters of fact which are to be considered in determining whether one acting for another is a servant or an independent contractor.

In a workmen's compensation case, this court stated: "The primary test in determining whether the relationship of employer-employee exists is whether the alleged employer has the right of control and supervision over the work of the alleged employee and the right to direct the manner in which the work is to be done as well as the result which is to be accomplished." Gardner v. Kothe, 172 Neb. 364, 109 N. W. 2d 405.

The facts of each particular case must be considered in determining whether a master and servant relationship existed. If it did, the master is subject to liability for the torts of his servants committed while acting in the scope of their employment. Restatement 2d, Agency, § 219, p. 481. The case of Sanford v. Goodridge, 234 Iowa 1036, 13 N. W. 2d 40, is similar to the one at bar in many respects, including the general nature of the contract as well as the type of business and vehicle involved. The language of the court in that case is appropriate here. "An employer cannot insulate himself against the burdens of the employer-employee rela-

tionship by a contract that leaves him with the control benefits of that relationship. Nor can he escape his liability under the doctrine respondeat superior by a contract that expressly provides that the workman is an independent contractor, if in fact, under the entire contract, the workman only possesses the same independence that employees in general enjoy."

Here the evidence could have justified a finding by the jury that the written contract did not constitute the entire agreement between the parties and that Co-op maintained control over the methods of carrying out the contract. The facts justified a finding that Taylor had no more independence than employees in general enjoy. The effect upon control involved in Co-op's right to terminate the contract on short notice without liability to Taylor was clearly material. The issue of whether the defendant Taylor was an independent contractor, or a servant, or employee of Co-op was properly submitted to the jury.

The next group of assignments of error rest on the premise that the negligence of the defendant Meirose should have been imputed to the plaintiff's decedent, and that the negligence of Meirose barred any recovery by the plaintiff.

The defendant Meirose resided in the buildings on his farm but leased the farm land to his son, who lived on a nearby farm. The decedent Sandrock also lived on a nearby farm and exchanged work with Meirose' son. On the date of the accident, the decedent Sandrock was helping the younger Meirose mow hay when a part on Sandrock's mower broke. After the noon meal, Sandrock asked the defendant Meirose to take him to town. Meirose agreed to take Sandrock to town so that Sandrock could get the broken part repaired. There was no other purpose for the trip.

On the basis of these facts, Taylor and Co-op contend that the defendant Meirose was acting as an agent on behalf of Sandrock and subject to Sandrock's direction

and control and solely for Sandrock's purposes and bene-fit. Therefore, they assert that Meirose' negligence is imputed to Sandrock and bars any recovery as against them.

This case was tried and the instructions were given on the basis of a host-guest relationship rather than that of agent and principal. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement 2d, Agency, § 1, p. 7.

There is no evidence here that the transportation was anything but gratuitous, resulting from a friendly and neighborly favor. There is no evidence of any mutual understanding that Sandrock had any right or power to control Meirose' operation of the car, nor that Meirose consented to act subject to Sandrock's control. There is no evidence whatever that Sandrock exercised or attempted to exercise any direction or control over the operation of the car. The fact that Sandrock requested the ride is not controlling. See, Renich v. Klein, 230 Wis. 123, 283 N. W. 288; Hynek v. Milwaukee Automobile Ins. Co., L., Mutual, 243 Wis. 591, 11 N. W. 2d 352.

This state, for many years, has followed the rule that the negligence of a driver is not imputable to a passenger except where the driver is the servant or agent of the passenger, or where the driver and passenger are engaged in a joint enterprise or where the passenger assumes to direct operation of the automobile and to exercise control over it. See Petersen v. Schneider, 154 Neb. 303, 47 N. W. 2d 863. Such cases probably reflect the view that ordinarily an agency does not arise out of purely social relationships. See Hynek v. Milwaukee Automobile Ins. Co., L., Mutual, *supra*. The rule of nonimputation of negligence has been extended to cases where an owner is a passenger in his own automobile. See Petersen v. Schneider, *supra*. Unless some relationship existed between the passenger and the driver which

gave a passenger authority to direct or assist in the operation of the automobile, a passenger has ordinarily been classified as a guest, and the negligence of a driver has not been imputed to the passenger. Where there is no evidence of a relationship between the driver of an automobile and a passenger other than that of a gratuitous social host and guest, the mere fact that the trip is for the passenger's benefit and that he happens to have a business purpose, does not make the driver a controlled agent and the passenger a controlling principal; and the negligence of the driver is not ordinarily imputable to the passenger.

The district court was correct in concluding that the defendant Meirose was a host driver and the decedent Sandrock a guest passenger.

The final issue is whether the negligence of defendant Meirose, the host driver, was ordinary negligence or gross negligence.

Defendant Meirose was a retired farmer and was familiar with the intersection and the roads. His testimony was that he was driving at 20 to 25 miles per hour, although the defendant Taylor placed his speed at 35 to 40 miles per hour. Meirose testified that he looked to both right and left as he approached the intersection; that he did not see any dust; nor did he ever see the milk truck. His car had a manual shift and he shifted to second gear at about 100 feet from the corner. He last looked to the right at a point close to the intersection where he could see 100 to 150 feet to the east of the intersection and did not see the truck.

This case might be said to be a classic example of the effect of our guest statute. While Meirose was guilty of negligence as a matter of law, the issue here is whether there was sufficient evidence of *gross* negligence on his part. In the present state of our cases, it seems clear that on the evidence here, his negligence was momentary in nature rather than extending over a period of time and that as a matter of law Meirose' conduct did not

amount to gross negligence. See, Pavlicek v. Cacak,155 Neb. 454, 52 N. W. 2d 310; Callen v. Knopp, 180 Neb. 421, 143 N. W. 2d 266; Brugh v. Peterson, 183 Neb. 190, 159 N. W. 2d 321; Douglass v. Douglass, 183 Neb. 837, 164 N. W. 2d 661.

The judgment is affirmed as against Robert L. Taylor and against Osceola County Cooperative Creamery Association, a corporation. The judgment as to the defendant Casper B. Meirose is reversed and dismissed.

AFFIRMED IN PART, AND IN PART
REVERSED AND DISMISSED.