Frank L. LaFLEUR, Appellee,

v.

Francis N. LaFLEUR and Lois Ann LaFleur, Husband and Wife, Defendants,

and

Sioux City Newspapers, Inc., Appellant.

No. 89–20.

Supreme Court of Iowa.

March 21, 1990.

Lance D. Ehmcke of Eidsmoe, Heidman, Redmond, Fredregill, Patterson & Schatz, Sioux City, for appellant.

Daniel C. Galvin of O'Brien, Galvin & Kuehl, Sioux City, for appellee.

Considered by HARRIS, P.J., and SCHULTZ, LAVORATO, SNELL, and ANDREASEN, JJ.

LAVORATO, Justice.

The plaintiff was injured when his father ran over him while the family was delivering newspapers published by the defendant newspaper company. After the plaintiff became of age, he sued his father and the newspaper company. The plaintiff alleged that his father was negligent. He also alleged that the company—on the theory of respondeat superior—was responsible for the father's actions.

The district court thought there was enough record evidence to generate a material fact question on the theory of action against the company. So the court overruled the company's motion for summary judgment. We conclude otherwise and reverse.

The facts are not in serious dispute. What is in dispute is the legal effect of these facts. So summary judgment is a proper way to resolve the father's status at the time of his son's injury. *See Jacobs v. Stover*, 243 N.W.2d 642, 643 (Iowa 1976).

In September 1978 the plaintiff—Frank L. LaFleur—was ten years old and still living with his parents. At the time Frank's brother and sister—James and Tammie—were newspaper carriers. James and Tammie each had written carrier contracts with the defendant, Sioux City Newspapers, Inc. Frank, however, had no such contract. Nor did his father, Francis. When Frank was injured, he and Francis were helping James and Tammie deliver newspapers.

The injury happened in the early morning hours of September 28, 1978. Frank had just delivered a newspaper and was heading back to his father's pickup. Frank ran into the path of the pickup which Francis was driving. The front wheel of the pickup ran over Frank's head, causing him severe and disabling injuries.

Frank's respondeat superior theory is premised on the claim that his father was an employee of the newspaper company at the time of the injury. If that is true, the company of course would be responsible for any negligence of the father at the time of the injury. *See Sanford v. Goodridge*, 234 Iowa 1036, 1042, 13 N.W.2d 40, 43 (1944).

The newspaper company takes the position that the father was an independent

contractor, not its employee. Generally, one is not responsible for the acts of an independent contractor. *Id.*

■ A number of courts have decided this issue, but the decisions have gone both ways. Generally, these courts have distinguished employees from independent contractors by applying the traditional tests governing the extent of control over the newspaper carrier. *See, e.g., Cable v. Perkins,* 121 Ill.App.3d 127, 76 Ill.Dec. 638, 459 N.E.2d 275 (1984); *Lewiston Daily Sun v. Hanover Ins. Co.,* 407 A.2d 288, 292 (Maine 1979). As one court noted,

> [t]he right to control the details of performance is the crucial factor in determining the status of an individual who performs services for another.

*Lewiston Daily Sun v. Hanover Ins. Co.,* 407 A.2d at 292; *accord McDonald v. Dodge,* 231 Iowa 325, 327–28 1 N.W.2d 280, 282 (1941).

■ When the person hiring has the right to control the details of the work as well as the results, there is an employer-employee relationship. *McDonald,* 231 Iowa at 328, 1 N.W.2d at 282. The right to control "must go beyond telling what is to be done, to telling how it is to be done." *Norton v. Day Coal Co.,* 192 Iowa 160, 164, 180 N.W. 905, 908 (1920).

■ In contrast, if the person hired is free to do the work without being subject to the order of the person hiring as to details, the hired person is an independent contractor. *Id.* The person employing an independent contractor may properly retain the control necessary to see the result is obtained according to plan. *Schlotter v. Leudt,* 255 Iowa 640, 643, 123 N.W.2d 434, 437 (1963).

Several courts have resolved the status issue of a newspaper carrier in favor of the newspaper companies on motions for summary judgment. *See, e.g., Fleming v. Foothill–Montrose Ledger,* 71 Cal.App.3d 681, 685, 139 Cal.Rptr. 579, 581 (1977); *Mirto v. News–Journal Co.,* 11 Terry 103, 107–08, 50 Del. 103, 107–08, 123 A.2d 863, 866 (1956); *Cable v. Perkins,* 121 Ill. App.3d 127, 128–29, 76 Ill.Dec. 638, 639,

459 N.E.2d 275, 276 (1984); *Murrell v. Goertz,* 597 P.2d 1223, 1226 (Okla.App. 1979); *Mid–Continent Freight Lines, Inc. v. Carter Publications, Inc.,* 336 S.W.2d 885, 889 (Tex.Civ.App.1960). In considering such motions, these courts focused on several facts about the right to control issue. *Fleming* presents a representative sample of these facts, which include the following:

1. The carriers bought from the company the newspapers they used to service their regular customers.

2. The carriers' compensation came from customer collections. The carriers paid the company the wholesale price and kept the difference.

3. The company did not issue checks or payments to the carriers, nor did it withhold any tax or social security for them.

4. The company delineated the carriers' routes, but the carriers could deviate from those areas.

5. The company suggested a delivery time to carriers and an approximate time of the month to collect for newspapers delivered.

6. The company made no suggestions about delivery procedure (including whether or not the carrier could be assisted in making deliveries).

7. The company would "discuss" the carriers' failures to deliver the newspapers on time or the carriers' failures to collect at reasonable hours.

8. The carriers' contracts provided for a two-week notice before either party could terminate the contracts.

*Fleming,* 71 Cal.App.3d at 685, 139 Cal. Rptr. at 581.

■ Here Francis LaFleur had no carrier contract with the company. But his two children did, and Francis signed a parental consent to, and a guarantee of, those contracts. The consent and guarantee provided that the children had his

> full permission to takeover and be responsible for the delivery and collections of [the designated routes] under the terms and conditions of [the children's]

independent carrier delivery agreement[s]. I agree to be responsible for any and all collections from subscribers while my [children are] under said contract[s] and agree to pay or cause to be paid, all monies due [the] company under said agreement[s], and hereby further agree and consent to any bond coverage of the carrier[s] as required by the company and hereby expressly waive any right of exoneration hereunder by reason of such bond coverage.

I agree to cooperate and encourage such cooperation from my [children] in the performance of [their] agreement[s] to the mutual satisfaction, benefit, and profit of [all] parties.

Clearly under the terms of this consent and guarantee any relationship between Francis and the company was to be governed by the carrier contracts. So the terms of these contracts bear directly on the right to control issue.

Such terms included the following:

1. The company agreed to give the carrier the right to deliver the company's newspaper on the designated route.

2. The company agreed to sell and deliver to the carrier as many newspapers as necessary to service the route.

3. Title to the newspaper passed from the company to the carrier at the time of delivery to the carrier.

4. The carrier agreed to buy from the company newspapers at the wholesale rate and pay for them each month. (Although the carrier contract did not expressly say so, the carrier sold the newspapers at retail and kept the difference out of collections from customers.)

5. The carrier agreed to deliver the newspapers regularly and promptly in accordance with established newspaper practice.

6. The company agreed to try to increase circulation at its own expense. The carrier agreed to use the carrier's best efforts to increase circulation.

7. Each party acknowledged and agreed that the carrier was an independent contractor and not an employee of the company.

8. The carrier agreed to assume the risk of profit or loss from the purchase of the newspapers at the wholesale price and the resale at retail.

9. The carrier agreed to be solely responsible for the risk of collection from subscriptions and for all expenses the carrier incurred in carrying out the contract.

10. The parties agreed that the carrier would deliver the newspapers according to the carrier's own means and methods and would not be subject to the control and supervision of the company. The carrier, however, agreed to be responsible for the results of the carrier's work.

11. The contract could be terminated by either party giving three weeks' notice. But either party could terminate the contract on twenty-four hours' notice because of a breach by the other party.

The parties expressly acknowledged in the carrier contract that the carrier was an independent contractor and not an employee. In addition the contract expressly provided that the carrier would use the carrier's own methods and would not be subject to control and supervision of the company. These terms are clear: the parties intended that the carrier would be an independent contractor and not an employee. This is an important consideration in determining what sort of relationship the parties created. *See Gabrielson v. State,* 342 N.W.2d 867, 876 (Iowa 1984).

The method of compensation here was the same as the method of compensation in *Fleming.* The compensation was geared to result and not to the amount of labor performed. This too is an important factor distinguishing an employee from an independent contractor. *See Fleming,* 71 Cal. App.3d at 687–88, 139 Cal.Rptr. at 582–83.

Moreover, the carrier here took title to the newspapers upon delivery and assumed the risk of loss from sales and collections. These two factors plus the method of compensation immediately suggest that the carrier would be engaging in a business rather than being employed at a flat rate per hour. One additional fact buttresses this conclusion: The carrier received no other form of compensation such as salary or commission and received no employee benefits.

The three weeks' termination provision in the carrier's contract is more consistent with an independent contractor relationship than an employer-employee relationship. As one court noted,

> [the] power of the employer to terminate the employment at any time is a strong circumstance tending to show the subserviency of the employee, since it is incompatible with the full control of the work usually enjoyed by an independent contractor. Perhaps no single circumstance is more conclusive to show the relationship of an employer than the right of the employer to end the service whenever he sees fit to do so.

*Fleming,* 71 Cal.App.3d at 686–87, 139 Cal. Rptr. at 582.

There was no evidence that the parties did not abide by the carrier contract terms. Such a lack of evidence may alone be sufficient to establish that the contract is conclusive on the question of the carrier's status. *See Cable v. Perkins,* 121 Ill.App.3d at 128–30, 76 Ill.Dec. at 639–40, 459 N.E.2d at 276–77.

There are other factors tending to show that the company did not have control over the way the carriers were to deliver the newspapers. For example, the company had no rules against carriers using the services of a helper. Nor did the company direct carriers to follow a particular procedure or method in delivering the newspapers.

Carrier independence was manifested in other ways. First, if a customer did not pay, the company allowed the carrier to terminate services but did not reimburse the carrier for any loss. Second, carriers were expected to purchase their own supplies and were not told what type of supplies they should purchase. Third, there was no evidence that the company penalized carriers for customer complaints about nondeliveries or late deliveries. Fourth, there was no evidence that the company told carriers how to bundle newspapers or what method of transportation should be used in making deliveries. Last, although carriers could expand their routes by soliciting more customers, the company did not require them to do so.

There were, however, several things the company did that tended to show the company was exerting some control over details of the work. For example, the company suggested that the carriers deliver the newspaper by 6:30 a.m., Monday through Saturday, and by 7:30 a.m. on Sundays. Because the routes required mobile delivery due to their size and location, the company gave the LaFleur carriers an allowance for mileage. The company also helped defray the cost of a drop-off box built by Francis. On one occasion, when the LaFleur family vehicle broke down, a company supervisor allowed the family to use his car to complete their deliveries. And when Frank was injured, a supervisor helped the family finish making deliveries.

> In our judgment, in these instances a certain limited right of supervision was exercised or at least reserved to the company so as to enable them to see to it that the final result contemplated by the arrangement was accomplished, but not such right of supervision over the methods, details, and particulars of the work as to give rise to the relationship of employer and employee.

*Bernat v. Star Chronicle Publishing Co.,* 84 S.W.2d 429, 433 (Mo.App.1935).

We conclude as a matter of law that Francis—the plaintiff's father—was not an employee of the company. The district court erred when it found that a material issue of fact existed as to the status of the father at the time of Frank's injuries. So we reverse the district court's ruling and remand for an order sustaining the motion for summary judgment.

REVERSED AND REMANDED WITH DIRECTIONS.