ALBERTA SMITH, EXECUTRIX, APPELLEE, V. MORTON MOTOR COMPANY, APPELLANT.

16 N. W. 2d 843

FILED DECEMBER 15, 1944. No. 31722.

Kennedy, Holland, DeLacy & Svoboda and Edwin Cassem, for appellant.

Crofoot, Fraser, Connolly & Stryker and George Evens, contra.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

PAINE, J.

This is an action for personal injuries and death because of failure to comply with the health and safety regulations as found in chapter 48, art. 4, Comp. St. 1929. Jury returned a verdict for $3,458.10, from which defendant appeals.

Albert Schmuck filed the first petition on October 3, 1940, and died December 23, 1940. His widow, who had remarried, revived the suit in her name as executrix, and prosecutes the first cause of action, for pain and suffering up to the time of his death, and hospital and medical expenses, for the benefit of the estate.

In this amended petition in such first cause of action, she alleges that said Schmuck entered the employment of the defendant company as a fender repairman; that the de-

fendant's work shop is in the rear of Thirty-first and Farnam streets, Omaha, and is about 25 feet by 53 feet in size; that the repaired automobiles were at once painted in this room where plaintiff's deceased worked, which room was not provided with a fan or other mechanical device to carry away the paint fumes; that he relied on the defendant to furnish him a safe place to work and warn him of any danger, and to provide the necessary safety devices; that his health became impaired; that he experienced headaches, nosebleed, chest pains, and finally became sick and had to go to a hospital and secure medical aid to stop nosebleed, and was confined in St. Joseph's Hospital until December 3, 1940. He went to the Douglas County Hospital on December 9; that he left there on December 16 and went to Tulsa, Oklahoma, where he died December 23, 1940.

The second cause of action is for his wrongful death under the Lord Campbell's Act, and alleges that he was capable of earning $25 a week as a fender repairman; that he contributed sums to the maintenance of his two minor children, and would have continued to maintain and support them during their minority, and that their pecuniary damage on account of the death of their father is $10,000, in addition to the damages set out in the first cause of action.

The answer admits that the plaintiff's deceased worked for the defendant company as a repairman in the repair shop; alleges that no complete painting job was done there, but only some lacquer put on repaired fenders for about an average of one hour a day; that the defendant had no reason to believe that Mr. Schmuck would be injured by said fumes, and denies that he was so injured, and alleges that if there were any risks and dangers incident to plaintiff's employment they were open, apparent, and obvious, and any such risks were an incident of his employment, and were assumed by him.

A verdict was returned for $1,200 on the first cause of action and $2,258.10 on the second cause of action. Five errors are set out for reversal in the brief of the appellant,

the fifth one being that the court erred in refusing to direct a verdict in favor of the defendant for the reason that the evidence was insufficient to support a recovery for the plaintiff.

The bill of exceptions, of over 600 pages and many exhibits, discloses the following facts: The plaintiff, Alberta Smith, married Albert Schmuck on July 11, 1927, and two children were born to this union. She divorced him in 1929, and remarried August 3, 1931.

Mr. Schmuck left Omaha in 1929, and remained away for years. He was employed by Alvin Cothern at Corpus Christi, Texas, who testified that Mr. Schmuck worked for him off and on from 1934 until 1940. He usually worked a few days at a time. The longest time was four months in 1938. The last work was in January and February of 1940, the records showing that he put in a week and a half in January, for which he was paid $23.50, and two weeks in February, for which he was paid $40. He said that he was a steady drinker, drinking all day long, averaging about a pint a day. He usually worked two or three days and then would lay off one or two days. The witness saw him the last day before he started back to Omaha. He testified that Schmuck carried his liquor well, rarely staggered, and did not talk much when he was drinking.

While working at Corpus Christi, his personal physician was Dr. N. D. Carter, who also testified by deposition taken at Corpus Christi. He first treated Albert Schmuck for a ruptured appendix, which was removed in 1933. He testified that he considered him an habitual drinker, and he would often cry around his office, and always promised to take some kind of a treatment to get off liquor; that as early as November 1, 1936, he treated him for nosebleed and packed his nose, and he came into the office several times thereafter. On March 12, 1940, he was admitted to the Spohn Hospital at Corpus Christi, where clinical records were kept, and photostatic copies are in the record. He had a slight cold, and was under the influence of alcohol when he was admitted, and the record shows "He had been

drunk for about a week, in fact, he stays drunk most of the time. He stated that he wanted to stay in the hospital a few days until he could sober up and recuperate from his cold."

In April, 1940, he came to Omaha from Corpus Christi in his brother-in-law's car. Mrs. Maude Gorsuch became his landlady, as he took an apartment with her on April 6, 1940. She said that he was very, very careless and right down filthy; that when he was taken to St. Joseph's hospital she cleaned up his bedroom and found 14 or 15 whisky bottles under the bed and about the same number of beer bottles; that she had to make two trips to carry them all.

From May 12, 1940, to June 21, 1940, he was hired by the defendant to straighten automobile fenders. He did no painting at all. They did no complete paint job in this repair shop. When a fender was straightened out the paint gun would be run for a few seconds to paint that spot. This spray gun, with its quart container, had a 50-foot hose plugged in on the air line, and could be carried around the repair shop, wherever a fender had been repaired.

Mr. Parfitt, his boss, did all the painting, and had operated spray paint guns for 18 years, without a mask, the last five years for the defendant, and in all of that time Mr. Parfitt had never suffered any irritating or harmful effects. Schmuck usually worked about 12 or 14 feet away from where this painting would be done, and it was during six weeks in May and June, when all the windows and the doors in the shop were open.

The defendant company had two masks there to use, but no one ever used them. One of the two employees brought his own mask to the shop, but never used it. None of the expert witnesses called by either side testified that there was anything poisonous in the lacquer which was used in this spray gun.

Dr. William J. Nolan was called as an expert by the plaintiff, and told of the method of operating the spray gun and the chemical contents of the spray used, and of the pigments which give it color; that the effect of breathing the

fumes would be an irritation to the respiratory tract, but after one became accustomed to it there would be no further irritation; that headaches would be caused if the lungs did not get enough oxygen; that the membrane lining of the nose might become irritated and might start to bleed; that Mr. Schmuck first came to his office on July 9, 1940, and that he took down the history of his case, and took care of him at St. Joseph's Hospital and Douglas County Hospital from August 19 until December 9, 1940. He said Schmuck complained of shortness of breath, poor appetite, a constant cough, a loss of weight, swelling of his ankles, and a buzzing sensation in the back of his head. He testified that Schmuck was 47 years old, weighed 175 pounds stripped, was six feet one inch tall, his tongue was heavily coated, throat reddened and congested, muscles were a little weak, the heart was enlarged and very rapid beating, about 140 times a minute, and irregular, showing it was getting decompensated. The blood pressure at the time of examination was 185 over 150.

He had a chronic kidney inflammation called nephritis, and a chronic heart condition called myocarditis, and a general asthenia, which means loss of strength, which came from lack of food and lack of proper function of his body, a chronic inflammatory lung condition, and a high blood pressure. "My opinion was that * * * these noxious gases and fumes that he inhaled aggravated his general body condition so as to make that condition worse, and thereby incapacitated him."

When Mr. Schmuck left St. Joseph's Hospital on December 3, 1940, Dr. Nolan wrote in the record that the cause of his disabilities on that day "were heart instability. * * * I do not feel that further hospitalization will benefit this patient, so he is accordingly discharged and dismissed."

On cross-examination Dr. Nolan admitted that hospital charts showed that he prescribed two ounces of whisky three or four times a day, straight or diluted as he desired, and continued that for days in somewhat diminishing amounts. He thought that whisky would help his cough.

Dr. Edmond M. Walsh testified that he was a specialist in internal medicine, practicing in Omaha for 12 years, and was assistant professor of medicine at Creighton University school of medicine. Albert Schmuck was under his care at the Douglas County Hospital in December, 1940, and he had the hospital records with him. The history given showed that his father and mother had both died of heart disease. He had a hemorrhage from the nose, his left side was slightly paralyzed, and the examination disclosed that he had a high blood pressure of 238 systolic over 170 diastolic, and his color was a little blue, he was short of breath, ankles swollen, liver swollen. He left the hospital, and the concluding notation is, "Hypertensive Heart Disease Congestive Heart Failure Improved."

Dr. E. L. MacQuiddy, also a specialist in internal medicine, made a study of all the hospital charts on Albert Schmuck at St. Joseph's Hospital, appearing in the record. He said that a blood pressure of 220 to 260 over 160 to 170 is called a malignant hypertension, because it is a dangerous blood pressure, and they usually "suffer a stroke and usually go out;" that at the request of the defendant Dr. MacQuiddy inspected the paint room and shop at the defendant company, and watched them spray, and inhaled the lacquer fumes, having the characteristic banana oil odor, and although he got a good whiff of it, it was not irritating, and "you could just barely get the odor at the other end of the room," with all of the doors and windows closed.

He had reviewed all of the current literature pertaining to the use of lacquers at the University of Nebraska medical college, because it being one of the newer developments there was very little in the textbooks about it. He testified there was nothing in these lacquers that is irritating or produces a harmful effect on the body, although if a person was in this spray day after day he might inhale enough benzol to produce anemia, but testified there was no anemia present in Albert Schmuck, and that it was a straight case of malignant hypertension, with no sign of poisoning or anything of that kind; that nosebleed is a common occurrence in malignant hypertension.

In this case it is admitted that a fan was not provided, as required by section 48-403, Comp. St. 1929, and that section 48-418, Comp. St. 1929, provides that any person violating such provision shall be liable to any person injured as a result thereof. The evidence discloses that Schmuck worked for defendant company from May 12 to June 21, 1940, and never worked elsewhere thereafter before his death December 23, 1940.

The question at once arises, is a violation of a factory law, requiring this fan to carry away these fumes, conclusive on the question of the liability of the defendant?

"Notwithstanding an employer has been guilty of failure * * * to comply with a statutory duty imposed for the benefit of employees, he can, in the absence of any statutory imposition of liability, be held liable for injuries to his employees only if there is a casual connection or relation between his negligence and the injury of which the employee complains." 35 Am. Jur., sec. 126, p. 555.

"The law seems to be well settled that, when a statute commands or prohibits a thing for the benefit of a person, he shall have a remedy upon the same statute for the thing enacted for his benefit, or for a wrong done him contrary to its terms. But it must be affirmatively shown that the plaintiff suffered some injury in consequence of the failure of the defendant to comply with the statute, and that such injury resulted proximately from such failure." *Strahl v. Miller*, 97 Neb. 820, 151 N. W. 952. See, also, *Omaha Street Ry. Co. v. Duvall*, 40 Neb. 29, 58 N. W. 531.

In the case at bar, the evidence, when carefully considered, proves that Mr. Schmuck had each and all of the symptoms and diseases which caused his death long before his few weeks' employment by the defendant. He had for years sought medical advice from doctors and aid from hospitals for extreme alcoholism and its attendant symptoms. He had had irritation of the nose and nosebleeds and headaches and had a cough long before he worked for defendant. He had also for some time had increasing difficulty from swollen ankles, and an excessively high pulse, as well

as a blood pressure which was so high that it indicated his death would occur within a short period, and none of these things were connected in the slightest way with the fact that he worked for defendant for a few weeks some months before he died, repairing fenders in a large room in May and June, with the windows open, when the fumes of "banana oil" from the lacquer, used only occasionally, were in the room.

"Defendant was not an insurer of the safety of the place in which plaintiff was working, but was required only to exercise ordinary care in furnishing him a safe place, and it was likewise required to exercise only ordinary care to warn and instruct him as to such dangers or hazards of his occupation as were not obvious." *Grant Storage Battery Co. v. De Lay,* 8 Cir., 87 Fed. 2d 726.

In our opinion, there was no connection proved between the fact that defendant failed to install a fan in this repair shop and the death of this unfortunate man some months later. Any possible connection would be but a mere guess, surmise, or conjecture; in other words, a mere possibility.

There can be no recovery when it is not proved that his working in a repair shop not provided with a fan, as required by law, affects the normal progress of his serious heart disease of long standing, nor that his ability to labor was thereby diminished, nor the date of his death substantially advanced.

This court has said in one case: "There is no evidence in the record that defendant's failure to comply with the building ordinances of the city of Omaha was the proximate cause of the injury. The only evidence on the subject is that plaintiff 'opened the door and stepped down and fell.' For aught we know she may have done any number of things that would have caused the accident and for which the defendant would not have been liable. The burden is upon the plaintiff and she has failed to produce any evidence to show that the act of defendant in violating the ordinance in any way contributed to this accident." *Winterson v. Pantel Realty Co.,* 135 Neb. 472, 282 N. W. 393.

Upon the record made in this case, the trial court erred in not directing a verdict for the defendant, for in our opinion plaintiff failed to prove a case, and the verdict and the judgment based thereon should be set aside and the action dismissed.

REVERSED AND DISMISSED.