CHARLES BESHALER, APPELLEE AND CROSS-APPELLANT, V.
BEN J. HELBERG AND GLEN HELBERG, DOING BUSINESS AS
WESTERN LIVESTOCK AUCTION COMPANY, ET AL.,
APPELLANTS AND CROSS-APPELLEES.
193 N. W. 2d 261
Filed December 23, 1971. No. 37982.

Maupin, Dent, Kay, Satterfield, Girard & Scritsmier,
for appellants.

Beatty, Morgan & Vyhnalek, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH,
McCOWN, NEWTON, and CLINTON, JJ.

SPENCER, J.

This is an action by Charles Beshaler against Ben J.
Helberg and Glen Helberg, and National Surety Corpora-
tion of New York, their bonding company, on the bond
required under the Packers and Stockyards Act of 1921,
for the balance due on the sale of 238 steers which sold
for $31,911.36. Defendants Helberg withheld $19,500
from the proceeds, contending this amount had been
loaned to Paul Geiser, an alleged partner of Beshaler,

for feed and transportation costs for the cattle. The jury returned a verdict for Beshaler on which judgment was entered. Beshaler cross-appeals from the disallowance of an attorneys' fee. We affirm the judgment and reverse the disallowance of the attorneys' fee.

During October 1961, Beshaler purchased 1,916 head of calves from Kiewit Ranches and paid for them with his personal check in the amount of $215,644.33. Geiser, an order buyer licensed under the Packers and Stockyards Act, acted as the agent of Peter Kiewit in the sale of the calves to Beshaler. Most of these calves were resold by Beshaler. Of those not sold, 207 head were put on wheat pasture in Texas, and 240 head on wheat pasture at Plains, Kansas. The proceeds of the 240 head that were at Plains, Kansas, are involved in this litigation.

Beshaler made arrangements with Geiser to take care of handling the calves in Texas and Kansas, and agreed that his compensation would be one-half of whatever gain was made, but Geiser was to see to the transportation and feed, and to take care of the calves. In January of 1962, the wheat pasture in Kansas froze and it was necessary to move the calves. Beshaler decided they should be sold, and on January 17, 1962, had them brought to the Western Livestock Auction Company, operated by the Helbergs at North Platte, Nebraska. Geiser's only interest in the calves was a share in the profits, if any.

On November 19, 1961, Geiser purchased 208 cull cows from a Kiewit ranch in Montana. Subsequently, in November Geiser purchased 441 head of cull cows from another Kiewit ranch, Pawnee Springs Ranch, at Maxwell, Nebraska. Geiser sold 196 head of these cattle to Glen for $27,534.60. Geiser was to pay for the Pawnee Ranch cattle on or before December 15, 1961, and on that date he issued his personal check in the amount of $62,899.80. At that time the balance in his bank account was $9.90. Geiser testified he told Glen he was in trouble, that he needed money to pay for the Kiewit

cattle, and on December 12, 1961, Glen gave him a check for $10,000. On the same date Glen paid him the balance on the 196 cows. On December 28, 1961, Geiser went to Glen at the sale barn and told him he needed additional money to cover the check for the Pawnee Springs cows, and received $9,500. Geiser still did not have sufficient funds, and on December 30, 1961, sold Beshaler 320 head of the cattle for $45,300. He then arranged for payment of the check.

Glen testified that when Geiser contacted him in December, he advised him that he had 238 head of steers on feed in Kansas and would need money to take care of the feed bill and the transportation costs, and Glen gave him a check for $10,000, drawn on a special account designated "B & G Feed Yard," which was a special account maintained by Ben and Glen Helberg. On December 29, 1961, Glen advanced Geiser an additional $9,500 by a check on the same account, making a total advance of $19,500, which Glen testified he believed was being advanced to pay for feed and transportation of the Kansas cattle.

When the cattle were sold on January 23, 1962, they produced a gross amount of $32,677.80, and Glen deducted the $19,500 due from Geiser and issued a check payable to Bud Beshaler and Paul Geiser, drawn on the Western Livestock Auction Company account, in the amount of $12,411.36. Glen further testified that a copy of the invoice and the check were duly mailed to Beshaler and should have been received by him on January 24th or 25th, 1962. The petition herein was filed August 12, 1964. Glen testified that he did not hear anything from Beshaler relative to the deduction for at least 18 months. The check was cashed February 27, 1962.

Beshaler testified that he attended the sale on January 23, 1962, but left before the sale was over. He received the invoice and the check referred to above by mail. He then called Glen and asked why $19,500 was deducted. Glen told him of the money he had advanced

to Geiser. He also told him that Geiser was on a big buying trip in Texas and would be gone for about 30 days. Upon Geiser's return, Beshaler contacted him and arranged for a meeting with Glen about February 23rd. It is Beshaler's testimony that at this meeting Glen said Beshaler should be paid his money, and as soon as he could arrange it with his father he would take care of it. Beshaler explained to Glen that he did need some money, and Glen told him to cash the check and they would straighten it out later. Beshaler talked to Glen approximately 3 weeks later about getting his money, and Glen said he was having a problem with his father understanding why the deal was like it was, and he needed additional time to get it ironed out. Beshaler testified that he contacted Glen at least once a month thereafter for 6 or 8 months.

Beshaler testified Geiser did not own any of the calves that were sold; that he did not authorize Helberg to withhold the $19,500; that he at no time authorized Geiser to borrow money on the calves; and that he never at any time made any representations to Helberg that Geiser was his partner, nor had Glen at any time talked to him about whether Geiser was his partner.

Geiser, who at one time had been employed by the Helbergs, testified that the $19,500 he borrowed from Glen had no connection with the Kansas cattle. Beshaler was the sole owner of those cattle. He had sold them for Kiewit to Beshaler. His only interest in the cattle was that he was to pay the trucking and feed bill for a share of the profits. He was to get half of the difference between the purchase and the sale price. He had never been in any partnership with Beshaler.

Defendants set out 16 assignments of error but argue only 7 of them. We consider only those which could be remotely prejudicial. The evidence is fairly conclusive that defendants failed to sustain their claim of a partnership. In any event, all possible issues were submitted to the jury which is the sole judge of the credibility of

witnesses and the weight to be given their testimony. Where a party has sustained the burden and expense of a trial and has succeeded in securing the judgment of a jury on the facts in issue, he has a right to keep the benefit of that verdict unless there is prejudicial error in the proceedings by which it was secured. Chaloupka v. State, 176 Neb. 746, 127 N. W. 2d 291.

Defendants' principal contention is that the trial court should have directed a verdict against Beshaler because he changed his testimony without reasonable explanation on a vital issue between the time of the trial and the taking of a deposition 5 years before. To have done so in this instance would have been erroneous.

We have held that if plaintiff, without reasonable explanation, testifies to facts materially different from his deposition concerning a vital issue, the change clearly being made to meet the exigencies of the pending action, the evidence is to be discredited and should be disregarded. Sacca v. Marshall, 180 Neb. 855, 146 N. W. 2d 375.

The principal point in question is whether Beshaler called Glen immediately upon the receipt of the check and invoice as he testified at the trial, or whether he got in touch with him within 30 days thereafter as indicated by the deposition. While the testimony raises a question of credibility, it is not within the rule set out above. Glen testified that Beshaler did not talk to him until at least 18 months after the check had been cashed. The evidence would support a reasonable deduction that whether Beshaler talked to Glen immediately or within 30 days, he did talk to him before the check was cashed. The issue was undoubtedly argued to the jury, and it is evident that it accepted Beshaler's version of the transaction.

Defendants complain that instruction No. 6 given by the court laid down inconsistent and confusing propositions to be considered by the jury. We assume they refer to instruction No. 3 because instruction No. 6 was not covered in defendants' assignments of error, and their

argument appears to be directed to that instruction.

The trial court submitted the instructions to the attorneys before they were given. Defendants, although they did object to some instructions, made no objections to either No. 3 or No. 6. In any event, instruction No. 3 is not misleading, erroneous, or prejudicial. Therein the court covered defendants' defenses of partnership, partnership by estoppel, accord and satisfaction, and estoppel. The court set out the specific elements necessary to be proved to establish any of the four defenses. It is defendants' position that the language in the instruction is in conflict but we do not so consider it. When the instruction is read in its entirety, we do not feel that the jury could have been misled by it.

Defendants assign as error the failure to give a tendered instruction to the effect that Paul Geiser had been convicted of a felony and that this evidence was made known to the jury so it could judge his credibility. The following appears in evidence in the testimony of Mr. Geiser: "Q Mr Geiser, this deposition is being taken at the Nebraska Penal and Correctional Complex, where you are presently an inmate. Were you convicted of a felony? A Yes. Q And out of what county, Mr. Geiser? A Cherry County. Q What was the date of your conviction? A October 5, 1966." The testimony therefore clearly indicated that the witness was a convicted felon.

Instruction No. 10 given by the trial court on this point was as follows: "You are the sole judges of the credibility of the witnesses and the weight to be given to their testimony. In determining the weight which the testimony of the witnesses is entitled to receive, you should consider: * * * 8. Evidence of previous conviction of a felony; * * *." There is no merit to defendants' assignment.

Beshaler cross-appealed from the disallowance of an attorneys' fee herein under section 44-359, R. R. S. 1943, which provides as follows: "In all cases where the beneficiary, or other person entitled thereto, brings an action

at law upon any policy of life, accident, liability, sickness, guaranty, fidelity, or other insurance of a similar nature, or upon any certificate issued by a fraternal beneficiary association, against any company, person or association doing business in this state, the court upon rendering judgment against such company, person or association, shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his recovery, to be taxed as part of the costs. If such cause is appealed, the appellate court shall likewise allow a reasonable sum as an attorney's fee for the appellate proceedings."

The bond issued by the defendant, National Surety Corporation of New York, provides in part as follows: "KNOW ALL MEN BY THESE PRESENTS: That we Ben J. Helberg and Glen Helberg d/b/a Platte Valley Sales Co. and Western Livestock Auction Company of North Platte, Nebraska, as Principal and NATIONAL SURETY CORPORATION OF NEW YORK, NEW YORK, as Surety are held and firmly bound unto Lester Langford of North Platte, Nebraska (or his successor in official position if any) as trustee for all persons who may be damaged through the breach of this bond, as obligee, in the sum of sixty-four thousand and no/100 Dollars * * *."

One of the conditions of the bond is as follows: "NOW THEREFORE, THE CONDITION OF THIS BOND IS SUCH THAT—1. If the said Principal shall safely keep and faithfully and promptly account for and pay to the owners or their duly authorized agents the proceeds of sales of all livestock received for sale on a commission basis by said Principal at a public stockyards, as defined in the Act of Congress known as the Packers and Stockyards Act, 1921, as amended; * * *."

Defendants argue that plaintiff, having failed to plead or prove any claim for attorneys' fees, is now barred, and cite two Nebraska cases in support thereof. Those cases give no comfort to the defendants. The first is Lawler v. American Surety Co., 101 Neb. 741, 164 N. W.

1050, in which it was held that plaintiff at a subsequent term of court could not have a retaxation of costs so as to award him an attorneys' fee. Judgment was rendered on October 6, 1915. Two days later plaintiff filed an application for the allowance of attorneys' fees. This was overruled, and the term at which the judgment was entered adjourned sine die October 30, 1915. Subsequently, the defendant paid the full amount of the judgment and costs into court. Plaintiff received and receipted for the same. On December 8, plaintiff filed another motion to retax costs, which was overruled, and plaintiff then perfected an appeal. It is obvious that plaintiff's failure to appeal from the overruling of his first motion for the allowance of attorneys' fees made that issue res judicata.

The other case cited by defendants is Haley v. Fleming, 148 Neb. 407, 27 N. W. 2d 626, which involved a construction of section 25-1801, R. S. 1943, and is not in point herein. That case reached this court on a motion to dismiss, and there was no evidence of any nature as to the pleadings or evidence to show the existence of the conditions precedent to an allowance of an attorneys' fee under that statute.

Defendants are in error in suggesting that there are no Nebraska cases exactly in point. Luikart v. Flannigan, 130 Neb. 901, 267 N. W. 165, would appear to indicate otherwise. In that case the defendants argued that the record was defective in that the petition did not contain a claim for an attorney's fee; it was allowed at a subsequent term of court and not " 'upon rendering judgment' " as required by statute; and there is no evidence of the value of the services performed by counsel for plaintiff. The court brushed these objections aside with the following language: "A claim for an attorney's fee after judgment in favor of plaintiff in an action on a fidelity policy or bond may be presented by motion at a subsequent term of court—the course taken herein. Allen v. Tallon, 120 Neb. 611, 234 N. W. 411."

Finding no prejudicial error, the judgment is affirmed except for the disallowance of an attorneys' fee, and the case is remanded to the district court for the allowance of an attorneys' fee for services in that court. Plaintiff is allowed an attorneys' fee of $500 for services rendered in this court.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.