ALBERT SIMON, APPELLEE, v. OMAHA PUBLIC POWER DISTRICT, A PUBLIC COMPANY, ET AL., APPELLANTS, IMPLEADED WITH NATKIN & COMPANY, A CORPORATION, APPELLEE.

202 N. W. 2d 157

Filed November 10, 1972. No. 38307.

184

L. J. Tierney and T. J. Stouffer of Cassem, Tierney, Adams & Henatsch and Pilcher, Howard & Dustin, for appellants.

David S. Lathrop of Lathrop, Albright & Dolan, for appellee Simon.

Gaines, Spittler, Neely, Otis & Moore and Joseph R. Moore, for appellee Natkin & Co.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

WHITE, C. J.

This is an appeal from a jury verdict and a money judgment for the plaintiff, Albert Simon, in a negligence action for personal injuries against the defendants, Omaha Public Power District and Gibbs, Hill, Durham & Richardson, Inc., who are architects and supervisors of the construction for the defendant, Omaha Public Power District. Another defendant, Natkin & Company, for whom Simon was working was impleaded as the plaintiff's employer for the assertion of its workmen's compensation subrogation rights, and both Omaha Public Power District and Gibbs cross-petitioned against Natkin for indemnity as to any amounts adjudged against them in favor of Simon. The jury returned a verdict for Natkin on both indemnity claims, from which finding the Omaha Public Power District and Gibbs, Hill, Durham & Richardson, Inc., appeal. We affirm

the judgment of the district court.

Plaintiff Simon, working as a steamfitter for Natkin, was seriously injured when he fell through an opening in the floor deck of a building under construction known as Unit No. 5 in OPPD's expansion of the North Omaha Power Plant. OPPD was the owner of the premises and its own general contractor. Gibbs, Hill, Durham & Richardson, Inc., hereinafter referred to as GHDR was the consulting engineer and architect engaged by OPPD. The various assignments of error raised by OPPD and GHDR assert, in substance, that the trial court should have sustained their motions for judgment notwithstanding the verdict on the grounds of the insufficiency of the evidence and that there was error in the instructions to the jury.

Boiled down, the contentions of OPPD and GHDR require a determination by this court as to the following:

(1) What was the duty or standard of care owed by them to Simon;

(2) With relation to the instructions to the jury, what was the effect of safety standards which were introduced at trial and based on expert testimony that they were recognized by the construction industry, OPPD and GHDR, and incorporated into regulations issued by the Nebraska Department of Labor; and

(3) The effect of deposition testimony by Simon that was contradictory of his trial testimony as to lookout and knowledge regarding the opening through which he fell.

It is necessary for an understanding of the precise issues presented that a comprehensive and detailed statement of the facts be given.

In 1964 OPPD engaged GHDR to act as consulting engineer in construction of a new generator addition to the North Omaha Power Plant. In their contract, GHDR made the following promises, among others, as regards their undertakings:

"We will manage and supervise the entire construction including: .

"1. Overall planning and management of the construction work and building operations will be furnished in addition to coordinating, scheduling, and expediting the work of the various contractors, handling incidental field engineering, and performing all managerial functions incident to the over-all construction work as contrasted to the work of specific contracts.

"2. Inspect field work performed by various contractors to determine acceptability of the work. This service will include the necessary checking to insure compliance with the plans and specifications and to protect the District's interest in safety, housekeeping, fire prevention, and operation of the running plant." OPPD, however, reserved the right to control all phases of the work and to decide all matters pertaining to schedules, policy, and selection of key personnel of GHDR.

The conduct of GHDR under this contract is illustrated through the testimony of Mr. Donald Rutland, the construction superintendent for GHDR who was at the jobsite daily from September 1965 to July 1968. OPPD apparently relied on GHDR for the performance of all safety responsibilities as OPPD had no safety people on the job. In addition, Mr. Devereux, a State inspector, thought that Mr. Rutland worked for OPPD. Mr. Devereux's dealings were with Mr. Rutland, despite the fart that Mr. Ted Short, the OPPD liaison man at the site, was known by Mr. Devereux as the "over-all head of everything there."

Mr. Rutland made twice-daily safety inspections of the site. Mr. Rutland had men who very definitely undertook portions of the job of safety enforcement relative to his inspections, but GHDR had no one whose job was strictly safety enforcement. Neither OPPD nor GHDR had any craftsmen that could be put to work to cover a hole or opening discovered on inspection.

Mr. Rutland would direct one of the several contractors to build a cover. If possible, Mr. Rutland tried to find the contractor whose equipment was going to be installed in the hole, unless it was an emergency.

In the months prior to Simon's fall, Mr. Rutland acknowledged having received many complaints of open, unguarded holes from the State labor inspectors. Four inspection reports were received in evidence. Each reads the same as to item No. 10: "Are all elevators, shafts, and openings properly guarded? No." At no time did Mr. Rutland reject the receipt of these complaints or indicate that this was not his department. The six or seven contractors on the job were not cooperative respecting the complaints, and between the official complaints and Mr. Rutland's inspections the situation was recognized by Mr. Rutland as very serious. In fact, the situation was serious enough that a State inspector on February 7, 1967, was considering a shutdown of the site.

In this situation Mr. Rutland's response was only to continue the regular weekly safety meetings. These meetings had been initiated at the beginning of construction and continued until completion.

On February 9, 1967, Simon fell through a duct opening on the first floor. He was impaled on three one-foot, vertical, reenforcing rods of steel set in concrete on the ground floor directly underneath the duct opening. These rods were designed to form part of the foundation upon which a machine was eventually to rest. The rods, installed by a contractor other than Natkin, had existed for at least a year prior to the injury, and had never been boxed.

The dimensions of the duct opening were $3\frac{1}{4}$ feet by $3\frac{1}{2}$ feet. It had been created a long time prior to the date of injury, by a contractor other than Natkin, who had been awarded a contract for heavy piping. It was surrounded by an elevated flange to a height of approximately 4 inches.

The following facts might reasonably have been found by the jury from the evidence presented. The duct opening was located 3 feet south of a very large condenser opening which was surrounded by a guardrail. Slightly farther away and to the west a lube-tank opening, 7⅔ by 17 feet, was covered with planks overlaid with plywood. Adjoining it on the west was a large pipe hatch enclosed with a guardrail. There was no artificial lighting but the floor was adequately lighted by the absence of the north wall. The lighting around the duct opening was adequate but not so good as at adjoining places. In the words of a steamfitter who was with Simon at the time of the accident, "your eyes would probably take a little bit to get used to the different lighting there."

Simon, age 60 at the time of trial in July 1971, testified he had completed the tenth grade in school. He had been working intermittently 8 of the 10 working days immediately prior to February 9, 1967. On that morning Simon worked outside hoisting pipes to the west side of the first floor. After lunch he and other steamfitters in his crew attended a safety meeting. At the safety meeting, Simon's first, unguarded openings or holes were not mentioned. Simon had never been on the first floor prior to the injury.

After the safety meeting a foreman of Natkin ordered Simon and others to move cumbersome and heavy pipes into position for eventual hoisting through the pipe hatch. The first section, 40 to 60 feet long, was carried on the shoulders of 6 to 8 men. They walked southeast, stopping at times to maneuver around obstructions. They crossed the lube-tank opening and passed near the south railing of the condenser hole. Simon was near the front of the pipe section carrying the pipe on his right shoulder.

Someone behind Simon said he faced an obstacle and the pipe stopped. In order to help the man and continue the movement of the pipe Simon turned to his left and

slid back along the pipe taking two steps. He recalled nothing further to the time when, impaled on the rods, he looked upward at the duct opening. He had not seen the opening and had not known of it.

The hole or opening had not been covered or otherwise guarded for 3 months, and 1½ hours after the accident no cover was seen in the vicinity. No one else had been working on the floor that day. Only one of the steamfitters testified that he knew of the unguarded duct prior to the accident, and he had forgotten about it on the day of the injury.

A 76 page deposition was taken of Simon in May 1970. In that deposition Simon testified three times to lack of knowledge or sight of the opening prior to the fall. After that testimony he testified 10 times, several of which we infer from the context, that he had seen the duct opening when he had passed it. In the concluding part of the deposition he testified 2 times that prior to the accident he had not seen the hole and had not known of it.

At the trial Simon was able to offer only the following explanation of the contradictions: "No, I can't (explain the contradictions). It was just a misunderstanding and—I was completely baffled with so many questions they asked me about stuff that there really wasn't no way for me to remember."

Simon's expert, Mr. Veatch, qualified by 30 years in construction safety work, incorporated Section 8 of Part 12 of the USA Standard Safety Code for Building Construction in his opinion of reasonable conduct regarding a floor hole or opening. The code was part of the Nebraska Department of Labor regulations in force February 9, 1967, and was nationally recognized as a safety guide in the construction industry.

We examine the fundamental relationships between the parties. Simon, an employee of Natkin, who was a subcontractor for OPPD, was an invitee of OPPD with the consequent responsibility to Simon flowing from

that relationship. Niemeyer v. Forburger, 172 Neb. 876, 112 N. W. 2d 276. We have no difficulty in laying down the general principles of a specific owner-invitee duty involved herein. The duty of an owner in control of the premises where work performance under a contract with the owner is to be executed is to exercise reasonable care to keep the premises in a safe condition while the contract is in the course of performance. The possessor of land thus retaining control is subject to liability for personal injuries to business visitors (Simon in this case) caused by a natural or artificial condition thereon if he knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk of harm to the invitee. Niemeyer v. Forburger, *supra;* Morse v. Gray, 166 Neb. 557, 89 N. W. 2d 842. This duty, of course, is qualified by the usual caveat that an owner or possessor of land is not an insurer of business visitors on his premises and owes an invitee the duty to exercise reasonable care but such duty does not ordinarily encompass dangers either known to the invitee or so obvious that the invitee may be reasonably expected to discover them. Hansen v. First Westside Bank, 182 Neb. 664, 156 N. W. 2d 790.

The complaint of OPPD and GHDR centers around a challenge in the trial court's fifth particular of instruction No. 2 which commands consideration whether OPPD and GHDR were negligent in that they failed to provide the plaintiff with a safe place to work. We observe that the notion of "a safe place to work" has become an accepted component of Nebraska tort law in the employer-employee cases. Smith v. Morton Motor Co., 145 Neb. 396, 16 N. W. 2d 843; Gundy v. Nye-Schneider-Fowler Co., 89 Neb. 599, 131 N. W. 964; Kotera v. American Smelting & Refining Co., 80 Neb. 648, 114 N. W. 945. Their argument in substance is an attempt to restrict the rule requiring a safe place to work to the employer-employee relationship only. We

decline, as the trial court did, to so restrict the application of "the safe place to work" rule. It is clear from an examination of all' the instructions that the court in setting out specification or particular No. 5 as to the failure to furnish a safe place to work did not expand or enlarge the basic duty that we have stated is owed to an invitee to use reasonable care to keep the premises in a safe condition while the contract is in the course of performance. Nor is there anything misleading in the instructions given, when construed with the other instructions, by which the jury could be led to believe that the duty of the defendants was other than to protect Simon from the injuries caused by a natural or artificial condition when they knew, or by the exercise of reasonable care could have discovered, the opening or the condition which, if known to them, they should have realized as involving unreasonable risk to Simon.

One of the most important cases in our examination of this issue is Westover v. Hoover, 88 Neb. 201, 129 N. W. 285, 19 A. L. R. 215. We first observe that this case does not limit the notion of a safe place to work to only employer-employee cases. Brevity forbids extensive recitation but it is clear that Westover implicitly says that had the plaintiff's pleadings correctly stated his status as an employee of an independent contractor, and had the defect which caused the injury to plaintiff not been open and obvious, the defendant as an owner retaining possession and control of the premises during the work of an independent contractor may be liable to an invitee by reason of failing to provide a safe place to work. Summarizing the authorities on this subject, we can find no reasonable distinction between the notion of furnishing a safe place to work between an employer and an employee and the well-accepted duties under the common law of an owner retaining possession and control of the premises on which work is being performed by an invitee-employee of a subcontractor. The court made it clear in the instructions that the owner

was not an insurer and that in furnishing a safe place to work it was the duty of the owner to use only that degree of care in furnishing a safe place to work which reasonable and prudent men would exercise under like circumstances. See Prosser, Law of Torts (3d Ed.), p. 546.

We are aware that a large construction project, as many of the writers and authorities on this subject have observed, has many dangers which are inherent in or normal in construction work. Under these circumstances a safe place to work requires that the owner in possession and control of the premises should recognize that the work is likely to create during its progress a peculiar risk of physical harm to others *unless special precautions are taken*. See, Restatement, Torts 2d, §§ 416, 427; 41 Am. Jur. 2d, Independent Contractors, § 35, p. 795, and cases cited therein. We have already reviewed the detailed facts surrounding the opening or hole into which Simon fell. The long period of time it was open, the continual warnings of Rutland, and the other facts demonstrate conclusively there was ample evidence from which the jury could conclude that the defendants should have foreseen the actual accident which occurred was likely to happen if precautionary measures for covering or guarding the hole for purposes of preventing the injury were omitted. We have read the instructions complained of and we can find nothing in them which enlarges or magnifies the duty of OPPD and GHDR beyond that which the law commands of an owner to an invitee. We observe further that there is no evidence in this case which would indicate or which would give rise to a reasonable inference that the *uncovered* opening into which Simon fell' was necessary to the construction work; or that it was necessary for the rods upon which Simon was impaled to remain exposed for the long period of time which the jury could have found they were; or that either or both conditions were temporarily necessary during installa-

tion work; or that they needed to be so long maintained; or particularly that it was necessary the hole be open at the exact time and place of the accident.

The owner's duty to the invitee to provide a safe place to work under the circumstances cannot be delegated or avoided by contract where the owner retains possession and control of the premises. Wilson v. Thayer County Agricultural Society, 115 Neb. 579, 213 N. W. 966, 52 A. L. R. 1393; Restatement, Torts 2d, § 422. In Wilson v. Thayer County Agricultural Society, *supra*, we said: " '* * * The distinction is, when the work is one that will result in injury to others unless preventive measures be adopted, the employer cannot relieve himself from liability by employing a contractor to do what it was his duty to do, to prevent such injurious consequences. * * * and this duty continuously remains with the employer.' " See, also, Tralle v. Hartman Furniture & Carpet Co., 116 Neb. 418, 217 N. W. 952; Schneider v. Southwestern Bell Telephone Co. (Mo. App.), 354 S. W. 2d 315; 57 C. J. S., Master and Servant, § 603, p. 374; Sandrock v. Taylor, 185 Neb. 106, 174 N. W. 2d 186 (employer cannot insulate himself from his duties by a contract that leaves him in control of the operation).

We conclude from reading all the instructions that there was no error in reciting the failure to provide a safe place to work as a separate allegation of negligence. It is clear, considering all the instructions together, that the defendants were not made insurers or held accountable for anything but their negligence and failure to use reasonable care as that negligence was carefully defined by instructions Nos. 29, 30, and 31. The unchallenged rule in this jurisdiction is that instructions to the jury must be considered as a whole, and that when thus considered, if the law is correctly stated and the case fairly submitted, and the jury could not have been misled, a claim of prejudicial error in the instruc-

tions is not available. Beranek v. Petracek, 184 Neb. 516, 169 N. W. 2d 275.

OPPD assigns as error the giving of instructions Nos. 34 and 37. These instructions impute the negligence, if any, of GHRD to OPPD because it was acting as the agent of OPPD under their written contract. OPPD attempts to argue instruction No. 34, imputing negligence to OPPD, when considered with instruction No. 37, the finding of active and passive negligence, permitted the jury to find that the negligence of GHDR was the active negligence of OPPD. There is no merit to this contention. Only one reasonable conclusion could be drawn from the terms of the contract and the conduct of the parties under it, and that was that GHDR was the agent of OPPD and its negligence was imputable to OPPD. We will not repeat the basic facts in connection with this situation except to point out that the relationship here between OPPD and GHDR stems from a written instrument which is clear and unambiguous. The court, therefore, did not err in finding that GHDR was the agent of OPPD as a matter of law and any negligence of GHDR was imputable to OPPD. This contention further fails because it is clear that the jury could *not have found* the negligence of GHDR to be the active negligence of OPPD, under the instructions given. This is true because instruction No. 37 states that negligence which is imputed is passive negligence.

Another contention of OPPD is that the court erred in giving instruction No. 32 which stated substantially that any violation of a rule of the USA Standard Safety Code or of the Manual of Accident Prevention in Construction Code or of a rule of the Department of Labor of the State of Nebraska does not in and of itself constitute negligence, but is evidence of negligence to be considered with all the other facts and circumstances. This instruction correctly states the law. Evidence of this nature was introduced by expert testimony. A violation of an administrative rule or of a private safety

regulation is independent evidence of negligence, under all the circumstances, provided an expert witness incorporates the regulation in his opinion as to an issuable act of negligence and the evidence would probably aid the trier of fact. See, Darnell v. Panhandle Coop. Assn., 175 Neb. 40, 120 N. W. 2d 278; Quist v. Duda, 159 Neb. 393, 67 N. W. 2d 481; Union Stock-Yards Co. v. Goodwin, 57 Neb. 138, 77 N. W. 357.

Simon's expert, Veatch, incorporated Section 8 of Part 12 of the USA Standard Safety Code for Building Construction in his opinion of reasonable conduct regarding covering a floor opening or hole. OPPD now contends strenuously that the failure of the trial court to instruct as to the distinction between an "opening" and a "hole" was reversible error. This argument flows, not from any applicable statute, nor any common law standard, but merely from the fact that the court in its applicable instruction did not distinguish between that portion of the expert's testimony in which a hole and an opening are defined differently. Because of its importance we deal with this contention at length. Veatch, as has been mentioned, incorporated Section 8, Part 12, of the USA Standard Safety Code for Building Construction, in his testimony. Section 8 in relevant part reads:

"8.1 As soon as the opening is framed, all floor * * * openings within a * * * structure during * * * construction * * * shall be covered with planks so as to carry safely any load which may be required to be supported thereon, or shall be fenced in on all sides by a standard railing.

"8.2 Every floor hole into which persons can accidentally walk shall be guarded either by a standard railing and toe board on all exposed sides, or a cover of sufficient strength to safely support any load which may be placed thereon. While the cover is not in place, such holes shall be constantly attended by someone or

shall be protected by a portable enclosing rail that need not be of standard construction."

The court's instruction No. 2 is attacked as not advising the jury as to a proper distinction between a hole and an opening within the above two sections given to the jury by means of Veatch's expert testimony. Instruction No. 2 listed the following as plaintiff's allegation of negligence No. 4: "In failing to cover or constantly attend the *hole* through which plaintiff fell, all in violation of Section 8 of the American Safety Code for Building Construction, * * *." (Emphasis supplied.) Giving OPPD's argument maximum import we observe that nothing even hinted to the jury that the words "opening" and "hole" in the context of Section 8 are not equivalent.

Section 8 is found in Part 12 which begins with Section 0, definitions, as follows: "0.1  Floor Opening. The term 'floor opening' when used in this code shall mean an opening in any floor, platform, or pavement, twelve (12) inches or more in its least dimension.  0.2  Floor Hole.  The term 'floor hole' when used in this code shall mean an opening in any floor, platform, or pavement, less than twelve (12) inches but more than one (1) inch in its least dimension."

The argument then is that, under the facts, the space into which the plaintiff fell was an "opening" and not a "hole" within the code definition.  It is abundantly clear, however, that any error in failing to distinguish between the words "opening" and "hole" in the code is without prejudice.

As we have pointed out, this minute distinction between an opening and a hole was introduced into evidence as foundation and support for an expert opinion. There was not the slightest attempt by the court or any misleading of the jury in the instructions to the effect that OPPD was *bound* by any code-directed standard of conduct.  Rather the code was introduced only as evidence of negligence.  It was relevant evidence as to

the reasonableness of OPPD's conduct. Among other things it could be evidence that it was not an unreasonable burden for OPPD to adopt safety precautions which were commonly followed and promulgated in the construction industry; and, it would not be unreasonably burdensome for OPPD to know of and carry out the measures. Both of these considerations are independent of the precise measurement distinctions found in Part 12 of the code of which Section 8 is only a part.

We search the record to illustrate the fallacy of the contention that there was prejudice in this respect. *It was not brought out in any testimony that the code distinguishes between "hole" and "opening."* In fact, the testimony of Simon's expert would indicate that those who work with the code and breathe into it the practical construction treat "hole" and "opening" in the ordinary sense and meaning of those words. Certainly all connected with this case gave the words that kind of synonymous usage.

We observe further that counsel for Simon, OPPD, and GHDR regularly interchanged their use of the term "hole" or "opening" when attempting to illuminate both the overall pattern of events and the code itself. The Nebraska Department of Labor inspection reports, in evidence, ask whether "openings" are properly guarded. Throughout the briefs of both OPPD and GHDR hole and opening are used synonymously in both their ordinary sense and meaning. *Finally, instructions Nos. 13, 14, and 15 requested by OPPD referred to the open space in the floor as a hole.*

While we have discussed the issue of prejudice on its merits, the contention of OPPD must fall because it failed to proffer any instruction covering this measurement distinction and suggesting or pointing out to the court the code definitions and their significance. Having so failed, error cannot be predicated upon the failure of the court to instruct more fully. The fallacy of this argument is further pointed out by the fact that the

alleged error in the instructions here consists not in what they contain but in what they do not contain. (The code distinction between "opening" and "hole".) The objection is a negative one, and it is not contended there was any positive error in the instruction that was given. Under these circumstances, we may assume an instruction conference was held (Section (b), adopted by the Supreme Court with reference to jury instructions, page ix, NJI). It was clearly the duty of defense counsel to have presented any instructions which were thought necessary to supplement the instructions given. Kroeger v. Safranek, 165 Neb. 636, 87 N. W. 2d 221; Woodruff v. White, 25 Neb. 745, 41 N. W. 781. See, also, Baylor v. Tyrrell, 177 Neb. 812, 131 N. W. 2d 393; Graves v. Bednar, 171 Neb. 499, 107 N. W. 2d 12; Dorn v. Sturges, 157 Neb. 491, 59 N. W. 2d 751.

But we observe further that counsel for OPPD invited any alleged error. OPPD's requested instructions Nos. 13, 14, and 15 all referred to the "opening" as a hole in the ordinary sense. Having requested instructions using hole in the ordinary sense, and having failed to proffer an instruction covering the distinction, it is clear that prejudicial error cannot be found for the court's failure to incorporate and use a particular code definition. Kovar v. Beckius, 133 Neb. 487, 275 N. W. 670; Day v. Metropolitan Utilities Dist., 115 Neb. 711, 214 N. W. 647; Vorce v. Independent Telephone Co., 86 Neb. 27, 124 N. W. 836.

Even assuming that such an instruction would have been proper, to find error under these circumstances would require the trial judge to have acted as an attorney for the litigants and would overstep the bounds of judicial propriety. There is no merit to this contention.

We turn now to the contention of GHDR that it is not liable to the third party (Natkin) for its nonfeasance in carrying out its contract with the owner OPPD. Stripped to its essentials this argument rests basically

on the premise that GHDR had no contract with Natkin, and consequently owed no duty to Simon. GHDR argues that its contract with OPPD gave it no authority to stop the work; no authority to commandeer the employees of the various contractors and set them to work building or replacing covers for holes; and that it had no obligation to build and guard the covers itself. Perhaps the best answer to this is to reiterate the terms of the contract which GHDR entered into with OPPD. It assumed the duties of "handling incidental field engineering, * * * performing all managerial functions incident to the over-all construction * * *. Inspect * * * to protect the District's interest in safety." We observe that the primary duty of architects may usually be only to assure to the owner that before final acceptance the work has been completed in accordance with the plans and specifications; and that in this case, by written contract, GHDR assumed much more. We point out further the fact that OPPD relied entirely on GHDR for any and all safety duties owed by OPPD; that Rutland toured the project at least twice a day to inspect for unsafe or hazardous conditions; that Rutland directed various contractors to cover holes and openings; that Rutland's men undertook safety work although no particular persons were so assigned; and probably more important Rutland was the one to whom state inspectors would direct their reports and complaints, which as we have seen, were numerous. The interpretation given a contract by the parties themselves while engaged in the performance of it is one of the best indications of the true intent of the contract. Ordinarily, such a construction of the contract should be enforced. Lortscher v. Winchell, 178 Neb. 302, 133 N. W. 2d 448. See, also, Baxter & Sons v. Sofio, 182 Neb. 599, 156 N. W. 2d 141. We come to the conclusion there can be no question that GHDR assumed by written contract and by its conduct a substantial duty of safety owed by OPPD, and that it was reasonable for the jury to find GHDR

should have recognized that duty as necessary for the protection of third persons.

It is true that for a mere breach of his contract with his principal an agent is only liable to his principal; but in his undertakings the agent must have due regard for the rights and safety of third persons. If in the course of his agency he undertakes as a part of his contract to render service to his principal of a type which he should recognize as necessary for the protection of third persons, he must exercise reasonable care in the performance of the undertaking. It is not the contract which gives rise to the duty, nor is the standard of care increased or diminished by the status as agent, it in his common-law obligation to do that which he undertakes so as not to injure another. Fonda v. Northwestern Public Service Co., 134 Neb. 430, 278 N. W. 836, citing Baird v. Shipman, 132 Ill. 16, 23 N. E. 384.

GHDR actually undertook and entered upon the performance of safety inspection for its principal OPPD, following its written contract to do so. Having done so it was its duty to use reasonable care in the execution of its undertaking and contract so as not to cause any injury to third persons, and it cannot avoid this duty by abandoning its performance and leaving things in a dangerous condition without proper safeguards. Of course, the agent is not liable to strangers for injuries sustained by them because he did not undertake some performance owed solely to his principal and imposed upon him solely by his relation. That is nonfeasance. That, however, is not the case here where GHDR affirmatively contracted with OPPD to perform its duty and assumed and attempted to carry it out.

We shall not attempt in this opinion to draw any distinctions between the concept of misfeasance and nonfeasance. Assuming, as GHDR argues, that it is being held liable for "not doing," it is the "not doing" that the court in Fonda characterized as follows: " 'All this is not doing, but it is not the not doing of that

which is imposed upon the agent merely by virtue of his relation, but of that which is imposed upon him by law as a responsible individual, in common with all other members of society.' " Fonda v. Northwestern Public Service Co., *supra,* at pp. 439, 440.

The case law of other jurisdictions overwhelmingly supports our conclusion reached herein. See, generally, Southern Indiana Gas Co. v. Tyner, 49 Ind. App. 475, 97 N. E. 580; Atkinson v. Wichita Gas Co., 136 Kan. 854, 18 P. 2d 127; Van Winkle v. American Steam Boiler Co., 52 N. J. L. 240, 19 A. 472; Nelson v. Union Wire Rope Corp, 31 Ill. 2d 69, 199 N. E. 2d 769; Smith v. American Employers' Ins. Co., 102 N. H. 530, 163 A. 2d 564; Annotation, 6 A. L. R. 2d 284. Also, see the elevator inspection cases where breach of a duty of inspection gives rise to liability for injury to third persons. Bollin v. Elevator Constr. & Repair Co., Inc., 361 Pa. 7, 63 A. 2d 19; Dahms v. General Elevator Co., 214 Cal. 733, 7 P. 2d 1013; Higgins v. Otis Elevator Co., 69 Ga. App. 584, 26 S. E. 2d 380; Sheridan v. Aetna Casualty & Surety Co., 3 Wash. 2d 423, 100 P. 2d 1024; Banaghan v. Dewey, 340 Mass. 73, 162 N. E. 2d 807; Durham v. Warner Elevator Mfg. Co., 166 Ohio St. 31, 1 Ohio Op. 2d 181, 139 N. E. 2d 10.

Also, Restatement, Torts 2d, § 324A, and Restatement, Agency 2d, §§ 354, 355, affirm the principle that we announce here. The reasoning behind the rule is well stated in Comment a to Restatement, Agency 2d, § 354, as follows: "In the usual case, by undertaking a job a person prevents others from undertaking it, since the principal relies upon him to perform it * * *. If the work given the agent is for the protection of others, and the agent does not perform it, under ordinary circumstances the others do not receive the protection from the principal which otherwise they would have received. If such protection is essential to the safety of others and the agent at the time he undertakes to act should realize this, his intervention into the relations between

the principal and the others by his assumption of the duty to the principal creates a duty to the others to use care either to perform the service or to see that no harm results from his failure to do so. This is particularly so if the other has entered into an undertaking, dangerous unless protective means are used, relying upon the principal to give protection." The contention of GHDR is untenable and consequently the court's instruction reciting the failure to provide a safe place to work as a separate allegation of negligence to GHDR was correct.

It is argued that instructions Nos. 2 and 27 are error because they make GHDR an insurer of the safety of Simon. A reading of these instructions reveals nothing that could mislead the jury, and on the contrary, the instructions stress that neither OPPD nor GHDR is an insurer against accidents.

GHDR assigns as error the giving of instruction No. 33, in which the court erroneously construed the contract between GHDR and OPPD as a third party beneficiary relationship. While this would ordinarily be error, it is clear, since GHDR owed the affirmative duty, as a matter of law, to use care to maintain a safe place, under its contract, there could be no prejudicial error in the giving of this instruction.

The next contention of GHDR is that Simon's trial testimony, that he did not see the hole before he fell, must be discredited and disregarded as a matter of law because of the testimony in a *part* of his deposition where he states several times that he had seen the duct opening when he had passed it. The cases cited by GHDR are not applicable. It appears from the record that there was a large condenser opening, a lube-tank opening, and a pipe hatch opening all in addition to and in close proximity to the opening into which Simon fell. It is asserted that the testimony Simon gave in the deposition more than 3 years after the incident bars his recovery. The record reveals that the jury

could find there was confusion in Simon's mind as to which one of the openings was referred to. Confusion between these various openings and the duct was exhibited by both witnesses and counsel in the record in this case. In any event, the applicable rule in this situation was stated in Kipf v. Bitner, 150 Neb. 155, 33 N. W. 2d 518, where this court held that an extrajudicial admission appearing in the deposition of a party taken before trial is ordinarily not final and conclusive upon him, but it may be competent and admissible as evidence in contradiction and impeachment of his present claim and his other evidence given at the trial, to be given such weight as the trier of fact deems it entitled. See, also, Dorn v. Sturges, *supra*. Kirchner v. Gast, 169 Neb. 404, 100 N. W. 2d 65.

Both OPPD and GHDR appeal from the judgment against them on their cross-petitions for indemnity against Natkin, Simon's employer. Here again we meet the rationale of active and passive negligence, or misfeasance and nonfeasance. OPPD and GHDR argue that as between a third party proceeding as an indemnitee and an independent contractor in an action for injuries to an employee of the independent contractor, when the negligence of the independent contractor is active, and the negligence of the third party proceeding as an indemnitee merely passive, the third party has an action in indemnity against the independent contractor despite the independent contractor's compliance with the Nebraska Workmen's Compensation law. That question is not properly before this court and we, therefore, express no opinion on it.

Instructions Nos. 6 and 7 adequately presented the cross-petitions of OPPD and GHDR and their allegations of Natkin's negligence which were the foundation of the indemnity claims. It is, of course, essential that the one sought to be held as an indemnitor be found to have acted negligently. 42 C. J. S., Indemnity, § 23, p. 600. It is the lack of this essential element which is

fatal to the claims of error by OPPD and GHDR presented here. The trial judge, in this extremely complex case, wisely recognized the difficulty of a general verdict in this situation and gave the jury an opportunity to assess the negligence of each defendant separately by use of the special verdict form. See § 25-1121, R. R. S. 1943. Special findings Nos. 8 and 11 dispose of the cross-petitions of OPPD and GHDR in that the jury expressly found that Natkin was not negligent (whether actively or passively) in any one or more of the particulars set forth in the cross-petitions of OPPD and GHDR. Assuming that there was an issue of Natkin's negligence for proper consideration by the jury, the court did submit the allegations and the finding of the jury was adverse to those contentions. Finally, in special findings Nos. 14A and 15A the jury found that both OPPD and GHDR were actively negligent. There is no merit to this contention.

In a sweeping boom attack on the judgment OPPD and GHDR assign error in various other instructions, and we note the attack upon instruction No. 37 in conjunction with instructions Nos. 2, 27, and 33. Our conclusion is that these instructions made it easier for the jury to have found some kind of negligence in the conduct on the part of Natkin. The cross-petition of GHDR could not have been prejudiced by these instructions.

It is unnecessary to examine other assignments of error as they are without merit.

In conclusion, we observe the general rule that where a party has sustained the burden and expense of a trial and succeeded in securing a judgment of the jury on the facts in issue, he has the right to keep the benefit of that verdict unless there is prejudicial error in the proceedings by which it was secured. Beshaler v. Helberg, 187 Neb. 584, 193 N. W. 2d 261.

The judgment of the district court is correct and is affirmed.

AFFIRMED.

SMITH, J., concurs in the result.

SPENCER, J., dissenting.

I respectfully dissent because I do not believe that the owner of the premises should be held liable in this instance. The hole was protected by a 4-inch elevated flange, and was plainly visible. GHDR's foreman was supervising the work and was aware of the conditions of the place of employment. In my judgment the contractor is negligent as a matter of law. On this record I would also find assumption of the risk on the part of Simon.

In Laaker v. Hartman (1971), 186 Neb. 774, 186 N. W. 2d 494, we said: "While the owner of premises owes the duty to an invitee to exercise ordinary care to have the premises in a reasonably safe condition for use in a manner consonant with the purposes of the invitation, generally, there is no duty on the part of an inviter owner to protect an invitee against hazards which are known to the invitee or are so apparent that he may reasonably be expected to discover them and protect himself."

BOSLAUGH, J., joins in this dissent.