Coyle W. DUNCAN, Plaintiff, Respondent and Cross-Appellant,

v.

PENNINGTON COUNTY HOUSING AUTHORITY, Aukerman and Mazourek, Inc., Dan J. Brutger, John A. Wahl, Richard E. Schreifels, Norman A. Beekley, Joel Marthaler, Don Schaefer, Gary Nelson, Dale Barck, and Tom Rentz, Defendants.

AUKERMAN AND MAZOUREK, INC., Defendant, Third Party Plaintiff, Appellant and Cross-Respondent,

v.

DAN J. BRUTGER, INC., Third Party Defendant.

Nos. 12235, 12248.

Supreme Court of South Dakota.

Sept. 26, 1979.

Robert L. Varilek and David P. Olson, Rapid City, for plaintiff, respondent and cross-appellant.

Robert A. Warder of Gunderson, Farrar, Aldrich, Warder & De Mersseman, Rapid City, for defendant, third party plaintiff, appellant and cross-respondent.

WOLLMAN, Chief Justice (on reassignment).

These are appeals from the judgment entered on a jury verdict in favor of plaintiff and respondent, Coyle W. Duncan (Duncan), against defendant and appellant, Aukerman and Mazourek, Inc. (appellant), the sole non-settling defendant at trial of the matter. Appellant's third-party action against Dan J. Brutger was severed by the trial court from the trial of the primary case. In appeal # 12235, appellant appeals from the judgment of liability to respondent Duncan. We reverse and remand. In appeal # 12248, Duncan cross-appeals from the judgment. We affirm.

Duncan was an iron worker employed by Brutger, Inc., which was the general contractor on a project to build high-rise low-income housing for the Pennington County Housing Authority (PCHA). On January 9, 1975, Duncan sustained serious injuries as a result of a twenty-two-foot fall from a building known as "High-rise Project West" that was then under construction. He originally brought suit against appellant, PCHA, Dan J. Brutger, Inc., Dan J. Brutger (President of Dan J. Brutger, Inc.), John A. Wahl, Richard E. Schreifels, Norman A. Beekley, Joel Marthaler, Dan Schaefer, Gary Nelson, Dale Barck, and Tom Rentz (employees of Dan J. Brutger, Inc.). Prior to conclusion of the trial, all of the defendants except appellant entered into settlement agreements with Duncan. PCHA settled for $20,000, and the remaining settling defendants settled for $130,000. The jury returned a verdict for Duncan in the amount of $215,000.

There were no eyewitnesses to the accident that caused the injuries. It was established at trial that Duncan suffers from retrograde amnesia concerning the events surrounding the fall. The evidence did establish that Duncan was working on an unfinished landing in the stairway-well between the second and third floors when he fell against a temporary safety guard rail that failed to support his weight and allowed him to fall on the ground.

Appellant was hired by PCHA as architect for the two high-rise projects. Under the terms of the contract between appellant and PCHA, ten percent of appellant's fee was for appellant's supervision of the day-to-day construction. The contract made reference to appellant's duty to assure that all of the contractual documents were complied with throughout the construction period. Reference was made in these documents to the safety requirements contained in standards promulgated by the Occupational Safety and Health Administration (OSHA).

Appellant employed David Davies as a supervising agent. Mr. Davies visited each of the construction sites several times a day. On December 2, 1974, OSHA issued a citation against the construction site for three specific violations. One of these violations was that twenty percent of the temporary wooden railings in the building were not constructed according to standards. Mr. Davies, who had received this citation, testified that he knew the hand rails were inadequate.

■ Appellant's first contention is that it owed no duty to insure the safety of employees of the general contractor against injuries caused by temporary construction measures and devices. Appellant argues that its sole duty of supervision was to insure that the building, in its final form, was constructed according to the specifications contained in the building plans.

The trial court concluded that the contract between appellant and PCHA was ambiguous with respect to appellant's duty to Duncan to supervise the safety precautions taken at the construction site and submitted the issue to the jury.

In *Simon v. Omaha Public Power District,* 189 Neb. 183, 202 N.W.2d 157 (1972), the Nebraska Supreme Court faced a similar situation. In that case, plaintiff, an employee of an independent contractor, fell through a hole in the floor of a building the Omaha Public Power District was having constructed. The court noted the manner in which the ordinary extent of the duty of an architect may be enlarged: "We observe

that the primary duty of architects may usually be only to assure to the owner that before final acceptance the work has been completed in accordance with the plans and specifications; and that in this case, by written contract, [the architects] assume much more." 189 Neb. at 200, 202 N.W.2d at 168. The Nebraska court found the contract in that case to be an unambiguous assumption of supervisory responsibility by the architect and held that the architect may be liable when that duty is performed in a negligent manner. For a discussion of the rule that where architects have assumed supervisory duties for safety precautions via contract they may be held liable for injury stemming from a breach of that duty, see Annot. 59 A.L.R.3d 869 (1974).

Appellant's reliance upon the case of *Luterbach v. Mochon, Schutte, Hackworthy, Juerisson, Inc.,* 84 Wis.2d 1, 267 N.W.2d 13 (1978), is misplaced. In *Luterbach,* the court concluded that the owner-contractor agreement and the owner-architect contract should be construed together to determine the architect's duty. Language from the owner-architect agreement specifically provided that the architect should not be responsible for safety precautions and programs.

We conclude that the trial court did not err in submitting the question of appellant's liability to the jury.

■ Appellant next contends that the trial court erred in allowing the OSHA regulations to be introduced as evidence of the standard of care appellant was obliged to meet. Appellant argues that the express purpose of OSHA is to impose safety responsibilities solely upon employers. 29 U.S.C. § 653(b)(4) provides: "Nothing in this chapter shall be construed to . . . enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." Appellant concludes that this language evinces a congressional intention that

OSHA not create a statutory right of action by an employee against an employer. A fortiori, the Act may not be used to create a statutory right of action against one who is not an employer.

Appellant misconstrues the gist of Duncan's theory of liability. Duncan's cause of action does not arise as a result of a violation of some statutory duty created by the OSHA standards. Rather, it will lie only if Duncan's injuries were the proximate result of appellant's negligent breach of a duty that appellant undertook by contract to perform. As this court said in *Weeg v. Iowa Mutual Insurance Co.,* 82 S.D. 104, 110, 141 N.W.2d 913, 916 (1966):

> "Negligence which consists merely in the breach of a contract will not afford ground for an action by any one, except a party to the contract . . . . But where, in omitting to perform a contract, in whole or in part, one also omits to use ordinary care to avoid injury to third persons, who . . . would be exposed to risk by his negligence, he should be held liable to such persons for injuries which are the proximate result of such omission." [citation omitted]

One section of the contract between appellant and PCHA provides: "In addition to the general and supervisory services during construction, on-the-site inspection shall be provided by the Architect, *who shall undertake to obtain compliance with the contract documents* . . . ." (emphasis supplied). One of the contract documents appellant agreed to obtain compliance with was the OSHA standards. Accordingly, it was not error for the trial court to allow these documents to be introduced as evidence of the duty appellant agreed to perform. Similar use of OSHA standards was made in *Knight v. Burns, Kirkley & Williams Const. Co., Inc.,* 331 So.2d 651 (Ala.1976), where the court said: "Under proper circumstances Occupational Safety and Health Act provisions and regulations may be admissible for a jury to consider in determining the standard of care that a defendant should have followed . . . ." 331 So.2d at 654. For similar treatment of state regulations see *Weeks v. Prostrollo Sons, Inc.,* 84 S.D. 243, 169 N.W.2d 725 (1969); *Serles v. Braun,* 79 S.D. 456, 113 N.W.2d 216 (1962); and *Simon v. Omaha Public Power District,* supra.

■ Appellant next contends that the trial court erred in its treatment of the settlement entered into between Duncan and the other defendants, arguing that the failure of the trial court to apply the $20,000 received by Duncan from PCHA to appellant's share of the judgment results in a double recovery for Duncan. Appellant argues that the $20,000 should be applied against the $16,125 that the trial court found was appellant's share of the verdict, leaving Duncan with no collectible judgment against appellant. Duncan contends that the total of all settlements received should be used to reduce the jury verdict pro tanto, leaving $65,000 to be paid by appellant. We conclude that the $20,000 paid to Duncan by PCHA must be used to reduce the judgment pro tanto.

The settlement agreement between Duncan and PCHA provides in pertinent part:

> It is specifically acknowledged and understood that Duncan claims that additional parties, specifically, Aukerman & Mazourek, Inc., is liable and obligated to them, or may be liable to them, arising out of the same incident, jointly and severally, as joint tortfeasors, and it is understood that this release does not release any causes of action, claims or demands that Duncan may have against said Aukerman & Mazourek, Inc. However, this release is given pursuant to the provisions of SDCL 15–8 and consistent with South Dakota's Uniform Contribution Among Tort-Feasors Act. To that extent, *it is specifically acknowledged and agreed by Duncan* that this release does and shall be construed to release the Housing Authority and all of the officers, directors, agents and employees thereof, in full and, further, *that any sum or damages recovered against any other parties or any other persons, who may be claimed to be joint tortfeasors, shall be reduced in the sum of Twenty Thousand Dollars ($20,-*

*000.00),* or in such sum as shall be the extent of the pro rata share of the Housing Authority's obligation or liability for damages to Duncan, or either of them, however the same may be determined, whichever sum shall be the larger. (emphasis added)

The release given to the other tort-feasors provides in pertinent part:

This Release is given pursuant to the provisions of SDCL 15–8, the South Dakota Uniform Contribution Among Tort-Feasors Act. Accordingly, the undersigned agree that this Release shall be construed to release all of the above-named parties, to-wit: Dan J. Brutger, John A. Wahl, Richard E. Schreifels, Norman A. Beekley, Joel Marthaler, Don Schaefer, Gary Nelson, Dale Barck, Tom Rentz and Dan J. Brutger, Inc. in full and *it is further agreed by the undersigned that any sum or damages recovered against Aukerman and Mazourek, Inc.* or any other Third Party who may be claimed to be a joint tortfeasor, *shall be reduced by the sum given in consideration for this Release, to-wit: One Hundred Thirty Thousand Dollars ($130,-000.00) or in any other amount or proportion if greater than the consideration paid as may be determined by a Court or jury, as provided in SDCL 15–8–17 & 18, whichever sum shall be larger.* (emphasis added)

The statutes relied upon by the parties provide:

SDCL 15–8–15

When there is such a disproportion of fault among joint tort-feasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tort-feasors shall be considered in determining their prorata shares.

SDCL 15–8–17

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

Answering by special interrogatories, the jury found that PCHA was not negligent; that some of the group of nine settling defendants were negligent and that their negligence totalled 92%; that Aukerman and Mazourek, Inc., was negligent and that its negligence totalled 7.5% and that Duncan was contributorily negligent in the amount of .5%.

The trial court reduced the verdict by an amount equivalent to 92%, which is the percentage of liability assessed by the jury against the settling defendants other than PCHA. The trial court apparently multiplied appellant's 7.5% share of liability times the $215,000 jury verdict and concluded that the judgment against appellant should be for $16,125. The trial court did not deduct from the judgment the $20,000 settlement from PCHA, apparently on the theory that because the jury found PCHA not to be liable it was therefore not a joint tort-feasor under SDCL 15–8–11 to 15–8–22, the Uniform Contribution Among Tort-Feasors Law.

Appellant contends that the settlement agreement with PCHA was written in a manner that would require the $20,000 paid for the release to be deducted from the judgment, regardless whether PCHA was determined to be negligent or not. We agree.

In *Degen v. Bayman,* 241 N.W.2d 703 (S.D.1976), we held that the amount received in settlement from a party should be deducted from the judgment even though the settling party had never been judicially determined to be a joint tort-feasor. We adopted the view stated by the Supreme Court of North Dakota in *Levi v. Montgomery,* 120 N.W.2d 383 (N.D.1963), to the effect that the court will consider the issues as framed by the pleadings in determining the question whether a party is a joint tort-feasor. As stated by the North Dakota Supreme Court:

Where the plaintiff charges several defendants with tort, and one of the defendants buys its way out of the suit and is given a release and covenant not to sue, the court will not go into the question of liability of such defendant. The test in such case is: Was the defendant sued as a tort-feasor? If so, any liability of the remaining defendants to the plaintiff must be reduced by the amount paid for such release or covenant not to sue by such defendant. The question of actual liability in tort of any of the defendants so discharged by release and covenant not to sue is wholly immaterial.

120 N.W.2d at 389.

This treatment of the settlement amount paid by a defendant later found not liable to the plaintiff is the stance taken by the majority of courts. "The prevailing view, with some authority to the contrary, is that [the settlement amount] must be so credited [against the judgment] even where the person released was not in fact a joint tort-feasor, or was not liable to the plaintiff at all." Prosser, Law of Torts, § 49, p. 305 (4th ed. 1971) (footnotes omitted). Restatement (Second) of Torts § 885(3) (1977) states:

> A payment by any person made in compensation of a claim for a harm for which others are liable as tort-feasors diminishes the claim against the tort-feasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment.

Comment (f) following this section states in part:

> Payments made by one who is not himself liable as a joint tort-feasor will go to diminish the claim of the injured person against others responsible for the same harm if they are made in compensation of that claim. . . . These payments are commonly made by one who fears that he may be held liable as a tort-feasor and who turns out not to be.

Alaska's version of the Uniform Contribution Among Joint Tort-Feasors Act provides: "When a release . . . is given in good faith to one of two or more persons liable in tort for the same injury . . . it reduces the claim against the [other tort-feasors] . . . in the amount of the consideration paid for it . . . ." Alaska Code of Civil Procedure § 09.16.040. In *Layne v. United States*, 460 F.2d 409 (9th Cir. 1972), the defendant sought reduction of the judgment by the amount paid in settlement by a party charged as a tort-feasor but found not liable for the harm. The plaintiff argued that because the settler was not liable for plaintiff's damages the court was not required to deduct the settlement amount from the judgment. The Court of Appeals for the Ninth Circuit, applying Alaska law, stated:

> [Plaintiff] Layne misapprehends the purpose and effect of § 4 of the Uniform Act [AS § 09.16.040]. While § 4 changed the common law in one respect (i. e., by providing that release of one joint tort-feasor does not automatically release the other joint tortfeasors), it retained that part of the common law rule embodying the sound public policy of permitting a plaintiff to receive only the amount of his adjudged damages and no more, regardless of the source of the recovery. Since the principle is that there can be but one satisfaction for the same injury, whether or not the released party is in fact jointly liable with the defendant against whom a judgment is rendered is not relevant. In either case . . . "the amount paid for the release or covenant not to sue must reduce *pro tanto* the injured person's judgment against another."

460 F.2d at 411 (citations omitted). The court also pointed out the policy considerations that encourage settlements—"the disposition of claims without litigation, and the . . . simplification of the issues requiring judicial determination." 460 F.2d at 411.

Interpreting New Jersey law, basically a short version of the Uniform Act, the Maryland Court of Appeals stated, under facts similar to the facts in the case at bar, that

where one liable potentially, but not in fact, makes a settlement . . . even though he is later proved to have been free of negligence and not liable to the injured person . . . the majority view is that whether or not the person released was in fact a joint tortfeasor, the amount paid for the release . . . must reduce pro tanto the injured person's judgment against another.

*Steger v. Egyud,* 219 Md. 331, 341, 149 A.2d 762, 767–8 (1959).

In *Theobald v. Angelos,* 44 N.J. 228, 208 A.2d 129 (1965), the New Jersey Supreme Court, speaking through Chief Justice Weintraub, rejected defendant's argument that New Jersey's version of the Uniform Act required a full pro rata reduction of settlement amounts from the judgment rendered against him. The court held that New Jersey's Act, which defines joint tortfeasors in language identical to SDCL 15–8–11, requires a pro tanto reduction of the judgment by the amount paid by a settler where the settler is later found not liable for the wrong. "[E]ven though the payor was not a party to the wrong . . . a plaintiff has the sum in hand and there is no evident hardship in reducing his verdict against others by that amount." 44 N.J. at 236, 208 A.2d at 133. Chief Justice Weintraub then discussed the concept of "full satisfaction," citing the rule that there shall be but one satisfaction for a wrong because of the strong policy against unjust enrichment, 44 N.J. at 239, 208 A.2d at 135. *Theobald v. Angelos* stands for the proposition that "if the claimant settles with one who is charged with the wrong but who in fact is not a party to it, the sum received . . . shall be applied in reduction of the verdict against the culpable parties." 44 N.J. at 241, 208 A.2d at 136.

The aspect of the facts before us that makes the present case unique is that only in a technical sense can Duncan be considered to have received "full satisfaction." In terms of actual dollars, he has realized $150,000, whereas the jury determined that he was entitled to $215,000. Under SDCL 15–8–17, however, the $130,000 received in settlement from the group of nine defendants must go to reduce the judgment by either $130,000 or the amount "by which the release provides that the total claim shall be reduced, if greater than the consideration paid." Their release states that "any . . . damages recovered against Aukerman and Mazourek, Inc. . . . shall be reduced by the . . . One Hundred Thirty Thousand Dollars ($130,-000.00) or in any other amount or proportion if greater than the consideration paid as may be determined by a Court or jury . . . whichever sum shall be larger."

The jury found that the settling group was 92% liable. By settling early, however, this group could and did pay its judgment liability of 92% of $215,000, or $197,800, with a lump-sum payment of only $130,000. Duncan, to reduce his risk, delay and expense, agreed to the settlement. Therefore, while Duncan's hard cash does not total $215,000, he waived his right to that sum by deciding to settle early. He cannot be heard now to urge that because PCHA was found by the jury to have been non-negligent, its money should not be considered toward his judgment. As stated in *Luxenburg v. Can-Tex Industries,* 257 N.W.2d 804, 807 (Minn.1977), the injured party may not recover again if he has "received full satisfaction, or that which the law considers such . . . ." (citing *Gronquist v. Olson,* 242 Minn. 119, 126, 64 N.W.2d 159, 164 (1954)). See also *Couillard v. Charles T. Miller Hospital, Inc.,* 253 Minn. 418, 425, 92 N.W.2d 96, 101 (1958).

Duncan must be considered to have entered into the releases with the group of nine settlers and PCHA with the knowledge that the dollar amount he accepted could later be deemed to satisfy a larger share of the judgment, since SDCL 15–8–17 expressly provides for such a result in circumstances in which the parties have entered into settlements under the provisions of the Uniform Act.

We conclude, therefore, that appellant is not liable for monetary damages to Duncan and that the trial court erred in awarding judgment in any amount against appellant.

Our holding with respect to appellant's liability for damages makes it unnecessary to consider appellant's other claims of error.

### APPEAL # 12248

■ In this cross-appeal Duncan contends that certain instructions given to the jury were confusing and misleading. As our discussion in appeal # 12235 discloses, the factual issues concerning Duncan's injuries were rather straightforward; however, the issues relating to the relationships involved among the various defendants in this case were quite complex. There were sixty-seven separate instructions given to the jury. Our review of these instructions, taken as a whole, compels us to conclude that they fairly apprised the jury of the matters before it.

Duncan has not met his burden of showing that the instructions complained of were prejudicial. Mere assertions of what the jury may have concluded are insufficient. *Dwyer v. Christensen*, 77 S.D. 381, 92 N.W.2d 199 (1958). There appears to be sufficient evidence presented in the record upon which the instructions complained of could be based.

■ Finally, Duncan alleges that the trial court erred in refusing to grant a new trial after the trial court was shown an affidavit signed by the foreman of the jury stating that in spite of direct instructions to the contrary the foreman had reduced the verdict he intended to give plaintiff by the $150,000 received by plaintiff's settlement. A jury verdict may be impeached by the affidavit of a juror only when the jury has made its determination on the basis of chance. SDCL 15–6–59(a)(2); *Fales v. Kaupp*, 83 S.D. 487, 161 N.W.2d 855 (1968). The affidavit in the present case went to the mental processes of a juror. Accordingly, the trial court did not err in refusing to grant a new trial based upon this showing.

With respect to appeal # 12235, the judgment is reversed and the case is remanded to the circuit court with directions to enter judgment consistent with the views set forth in this opinion.

With respect to appeal # 12248, the judgment is affirmed.

DUNN and HENDERSON, JJ., concur.

MORGAN and FOSHEIM, JJ., dissent.

MORGAN, Justice (dissenting).

I dissent.

My disagreement is not with the basic law involved but rather with the application to the facts of the instant case. While the author abhors unjust enrichment of the plaintiff, by his application of the PCHA settlement to the appellant's portion of the verdict, he has given the appellant or its liability carrier a windfall in excess of $14,000.

In my view, the Uniform Contribution Among Tort-Feasors law, SDCL 15–8–11 to 15–8–22 inclusive, is primarily for the adjustment of liabilities between the joint tort-feasors.* Secondarily, it provides a vehicle for settlement in advance of suit between some but not all of the joint tort-feasors and the claimant, as opposed to the old covenant not to sue gimmick.

The cases cited in the opinion in favor of the *pro tanto* application of PCHA's contribution are alright as far as they go; however, none of them are on all fours with this case because none of them involve the element of additional tort-feasors who have likewise settled. We can uphold the theory of the *pro tanto* offset without unjustly enriching appellant by applying the PCHA contribution *pro tanto* against the initial verdict and then arrive at appellants' liability by multiplying the result by 7.5%. In this case however, I would first deduct from the initial verdict the plaintiff's percentage for comparative negligence, then deduct the PCHA contribution, and then apply the 7.5%.

I am hereby authorized to state that Justice FOSHEIM joins in this dissent.

---

* In this case the horizontal scheme of adjustment among the joint tort-feasors was not triggered by the filing of any cross complaints.